BAKER *v.* DAWSON ET UX.

[No. 171, September Term, 1957.]

*Decided April 30, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-

son, Prescott and Horney, JJ., and Carter, Chief Judge of the Second Judicial Circuit, specially assigned.

*Nicholas Orem, Jr.,* with whom were *T. Howard Duckett* and *Duckett, Gill & Orem* on the brief, for appellant.

*John E. Oxley* and *A. W. Starratt, Jr.,* for appellees.

Brune, C. J., delivered the opinion of the Court.

The appellant, N. Meyer Baker, as assignee of Leonard Auerbach, brought suit in the Circuit Court for Montgomery County against the appellees, William V. Dawson and Virginia M. Dawson, his wife, for specific performance of a contract for the sale by the Dawsons to Auerbach of an eighty-acre tract of land in that County. The Circuit Court dismissed the bill on the ground that some of the provisions of the contract were so indefinite as to prevent specific performance. Baker appeals.

Several other questions were raised by the defendants in the trial court and in this court, which were resolved by the Chancellor in favor of the appellant. They will be stated and considered below.

The Dawsons owned a farm consisting of three lots, Nos. 87, 88 and 89, in a subdivision designated as "Subdivision of the farm owned by Mrs. Mary J. Boland" on a plat thereof duly recorded among the land records of Montgomery County. These lots fronted on the road now known as "Old Route 240", and had a total frontage on that road of 1066.5 feet. The aggregate area of the three lots had been 92.72 acres. Some of the land at the rear of the tract—about three or four acres—had been taken by the State Roads Commission and, in addition, some two acres had been cut off or isolated from the rest of the tract, leaving about 86 or perhaps 87 acres between the new road and Old Route 240.

A licensed real estate agent, a Mr. Measell, who was associated with a licensed broker, a Mr. Sigler, obtained Mr. Dawson's assent to listing 80 acres of the Dawson tract for sale at a price which would net $500 an acre to the Dawsons, or $40,000 in all. The Dawsons wished to retain the dwelling

house on the farm and about six acres of land. The property was advertised, and on June 13, 1955, Sigler submitted to the Dawsons a proposed contract of sale signed by one Leonard Auerbach as purchaser. As originally presented the contract did not meet the Dawsons' terms and was not acceptable to them. It called for the sale of 85 acres, more or less, and provided for a total purchase price of $35,000. Of this $13,000 was to be paid in cash at the time of the conveyance and the balance of $22,000, to be secured by a first deed of trust on the premises, was to be payable "on or before" eleven years from the date of settlement, with interest at 5% per annum, and with instalments of "$2,000 or more each year, plus interest."

To meet the Dawsons' objections, Sigler proceeded to amend the agreement by pen and ink. He changed the area from 85 to 80 acres, more or less, the total purchase price from $35,000 to $42,000, and the aggregate deferred payments from $22,000 to $29,000; and he added this provision in the body of the contract: "The Seller agrees to deliver eighty (80) acres of land with 4 room tenant house such land having a frontage of 866.5 feet on Old Route 240." The agreement incorporated by reference a release and reservation clause designated as "Schedule A", which was on the reverse side of the document. The first paragraph of Schedule A was not changed. It reads as follows: "Seller agrees to release any of the acreage fronting on Old Route 240, beginning at the northeast corner of said property, upon the payment to Seller by purchaser of $1000.00 per acre, each acre to have a frontage on Old Route 240 of not less than 200 feet; and $500.00 per acre for each acre not fronting on the road. All acres released shall be contiguous." The second paragraph originally provided for exclusion from the contract of the residence and outbuildings presently occupied by the sellers and situated on a parcel of land with a frontage of 300 feet on Old Route 240 and a depth of 400 feet, which would amount to a little less than three acres. This was changed to "a frontage of 200 feet on Old Route 240 and a depth sufficient to take care of remaining acreage in excess of the eighty (80) acres covered by this contract."

These changes were initialed by the Dawsons, as Sigler testified and as the trial court found, and the contract was thereupon signed by the Dawsons. They signed at the foot of the contract and they also signed "Schedule A". These signatures were admitted by Mr. Dawson.

Sigler took the signed copies with him and submitted them a few days later to Baker, who was then acting as counsel for Auerbach. Auerbach approved the contract as amended and, in the presence of Baker, initialed the changes. This, according to Sigler's testimony, took place on June 18th. Sigler then notified the Dawsons that the farm was sold. He also said to Mr. Dawson that he would have the documents redrafted and would submit them to the Dawsons as soon as this was done. He accordingly had them copied by typewriter on the same type of printed form as that originally used (which was his customary form). All of the changes made in ink on June 13th were incorporated therein verbatim and no other changes were made in the text. Auerbach signed copies of the rewritten agreement and Sigler took them out to the Dawsons, who then signed them on June 19th, 1955, which was a Sunday. All signatures on the final form of contract were dated June 19th. Auerbach's signatures on the original form both on the face thereof and at the foot of Schedule A were dated June 13th; the Dawsons' signatures on the face thereof were also dated June 13th. Their signatures to Schedule A were not dated, but were actually affixed on June 13th. Auerbach paid to Sigler a deposit of $1,000 in accordance with the agreement.

Auerbach assigned all of his rights in the contract to Baker on August 13, 1955.

Other facts and other provisions of the contract will be referred to in connection with the particular questions to which they pertain.

### Date When Contract Was Made.

The Chancellor held, correctly, we think, that a valid contract was entered into between the Dawsons and Auerbach between June 13th and June 18th. When the Dawsons adopted the amendments to the form of contract submitted by

Sigler on June 13th and signed the agreement as amended by him during the conference on that date and delivered the agreement as revised to Sigler for submission to Auerbach, they made a counter offer. When Auerbach approved the changes (and initialed them) and so accepted the counter offer and notice of his acceptance was communicated to the Dawsons, as was done on or before June 18th, the contract was made. There is no contention that the re-executed version dated June 19th effected any change in the terms of the contract.[1]

In this situation we think the rule stated in 1 *Williston, Contracts,* Sec. 72, page 237, is applicable, that "if there has once been unequivocal acceptance, the contract is complete and its binding force cannot be affected by subsequent communications unless they amount to a mutual agreement to rescind or abandon the contract." See *Painter v. Brainard-Cedar Realty Co.,* 29 Ohio App. 123, 163 N. E. 57.

It is unnecessary for us, as it was unnecessary for the Chancellor, to determine whether or not a contract for the sale of real estate is void because made on a Sunday.

### Plaintiff's Standing as Assignee to Maintain Suit.

The defendants contend that the plaintiff, as assignee of Auerbach, cannot maintain this suit for specific performance, at least in the absence of Auerbach as an obligor or guarantor under the deed of trust to be executed to secure the deferred payments of the purchase price. The defendants point out that Auerbach is not a party to the suit and that he is not a resident of Maryland and urge that he is hence not amenable to the jurisdiction of the Circuit Court.

---

1. No such contention having been made, it would not be properly before this Court. Rule 885, Maryland Rules. A contention might conceivably have been made that a change was effected in the settlement date which was normally to be computed from the date of the sellers' "acceptance." Perhaps it was not made because it seems obvious that it would have availed the defendants nothing for the reason that if the agreement dated June 19th were *void* because made on Sunday, it would be wholly without effect as a modification of the valid agreement previously made.

It is perfectly evident that the contract is assignable. Indeed, it contemplates the possibility of assignment, and is made binding upon the respective heirs, executors, administrators or assigns of the sellers and of the purchaser. The rule has long been established in this State that "wherever the specific execution of a contract or covenant respecting lands would have been decreed as between the original parties, it will be decreed as between all persons claiming under them in privity of estate, or of representation, or of title, unless other controlling equities have intervened." *Worthington v. Lee,* 61 Md. 530, 535; substantially repeated in *Hollander v. Central Metal and Supply Co.,* 109 Md. 131, 154, 71 A. 442.

The defendants assert that this rule is inapplicable to the present case because they are entitled to the personal obligation of Auerbach under the deed of trust. The plaintiff points out that the contract does not provide for notes to be signed by the purchaser, but only for the giving of a deed of trust secured by the land. The similarity between deeds of trust, which are in common use in Montgomery and Prince George's Counties, and mortgages has previously been noted by this Court. *LeBrun v. Prosise,* 197 Md. 466, 79 A. 2d 543; *Silver Spring Title Co. v. Chadwick,* 213 Md. 178, 131 A. 2d 489. We have also had occasion recently to recognize and reaffirm the rule that if a mortgage or deed of trust of real estate is given as security for an indebtedness but contains no promise to pay the indebtedness, no implied covenant to pay it arises. See *Alexander v. Hergenroeder,* 215 Md. 326, 138 A. 2d 366, and cases therein cited. There is no indication in the contract or elsewhere in the evidence that the Dawsons relied on the personal credit of Auerbach.

Even if the contract of sale should be interpreted as requiring that Auerbach join in the execution of the deed of trust and of any notes which might be secured thereby, Baker has offered to procure Auerbach's joinder. It is true that Auerbach was not joined as a party to this suit, but there seems to be no reason why he should have been made a party initially. The Dawsons' objections to consummating the sale were based primarily (if not wholly) upon a controversy

over the making of a survey and over who should pay the cost thereof, and perhaps on a general claim of invalidity. We find no merit in their contention that Auerbach was not a party to the suit; and we think that in view of the position which the Dawsons took, it was sufficient for the maintenance of this suit that Baker offered, during his testimony, to obtain the joinder of Auerbach in whatever documents might be necessary. Relief might have been granted on condition that he do so. There was no lack of mutuality of remedy as that doctrine is now interpreted and applied by this Court. *Stamatiades v. Merit Music Service, Inc.,* 210 Md. 597, 124 A. 2d 829; *Messina v. Moeller,* 214 Md. 110, 133 A. 2d 75. Want of mutuality of remedy will not preclude specific performance unless the court finds that it is unable to insure the receipt by the defendant of that to which he was entitled under the contract.

A further ground for rejecting the defendants' contention on this point is that under the contract, which provided for payment of the balance of the purchase price "on or before" eleven years from the date of settlement and payments of $2,000 or more per year until payment in full should be made, there is no reason why the plaintiff should not be entitled to a decree for specific performance, if he so elected, conditioned upon the payment of the entire balance of the purchase price in cash upon a conveyance being made. *Trotter v. Lewis,* 185 Md. 528, 45 A. 2d 329.

As is stated in 138 *A. L. R.* 219: "Even though the contract calls for the vendee's personal obligation or signature, the assignee, by providing the same or, in some circumstances, a cash equivalent, may become entitled to a decree of specific performance."

In view of Baker's offer to procure Auerbach's joinder in whatever documents his joinder might be necessary and in view of the fact that the contract could have been satisfied by payment of the entire purchase price in cash, we think that Baker is not precluded, by reason of his failure to join Auerbach as a party or to make a tender in the bill of Auerbach's joinder in the execution of any necessary documents, from maintaining this suit for specific performance conditioned

upon either Auerbach's joinder in any necessary instruments or payment in full in cash. The Chancellor did not determine whether Auerbach's joinder in the deed of trust or in any notes to be secured thereby was required, nor do we consider it necessary to decide that question at this time. We do, however, in accordance with Rule 885, Maryland Rules, express the opinion that no notes, whether executed by Auerbach or by Baker, or by both of them, are required, since the contract does not call for any notes.

## The Alleged Uncertainties of the Contract.

The Chancellor held that the contract was so uncertain in the following respects as to bar enforcement by specific performance: first, and most important, with regard to the location of the land to be retained by the sellers and hence the exact description of the land to be sold to the purchaser; second, as to who was to pay the cost of the survey; and third, with regard to the terms of the deed of trust.

*Description of the Land.* The basis of the Chancellor's finding that the contract was indefinite as to the description of the land was that there was "no specification and no testimony as to where the beginning line was to be drawn in order to omit from the entire farm the acreage which was to be retained by the sellers under the terms of the contract." We do not agree with this view of the evidence.

The property sold is described in the first paragraph of the contract as the "Dawson Farm containing 80 acres more or less, also known as Mary J. Boland Farm in Montgomery County in the State of Maryland." The second paragraph incorporates "Schedule A" on the reverse side as a part of the contract and contains the covenant of the sellers (previously quoted) to "deliver eighty (80) acres of land with 4 room tenant house [,] such land having a frontage of 866.5 feet on Old Route 240." The provisions of Schedule A providing for the release of acreage have already been quoted. As will be recalled, the first paragraph of that Schedule called for the release of acreage fronting on Old Route 240 "beginning at the northeast corner of said prop-

erty" for $1000 an acre, that each such acre should have a frontage of not less than 200 feet, that land not fronting on that road should be released for $500 per acre, and that "All acres released shall be contiguous." The second paragraph of Schedule A describes the area excluded from the contract of sale and so to be retained by the sellers as the residence and outbuildings occupied by the sellers situated on a parcel of land "with 200 foot frontage on Old Route 240 and a depth sufficient to take care of remaining acreage in excess of the eighty (80) acres covered by this contract."

The evidence showed that Mr. Dawson in May, 1955, had furnished to Mr. Measell a copy of a recorded plat of the three lots which the Dawsons had acquired and which had been part of the Boland farm. A copy of this plat is in evidence. The easterly boundary of the three lots is a straight line bounding on Old Route 240, with a total length of 1066.5 feet. The northerly boundary runs in a more or less westerly direction from that road by three different courses, the first of which is roughly at a right angle to Old Route 240 and extends for 872 feet. The southerly boundary of the tract runs westerly from Old Route 240, also almost at a right angle thereto (though not quite parallel with the beginning of the northern boundary) and extends for a distance of 3029.5 feet. The buildings reserved to the sellers are all located within the tract reserved to them if the southernmost 200 feet of the frontage on Old Route 240 constitute the easterly line of that tract.

Reading Schedule A and other parts of the contract together (and Schedule A is a part of the contract), it is clear that the northeastern corner of the tract is included in the land to be sold; and bearing in mind that all lots to be released must be contiguous, it also seems clear that the area to be sold was intended to be a single, unbroken tract fronting on Old Route 240 and extending 866.5 feet southwards from the beginning point at the northeastern corner. That leaves the southernmost 200 feet of frontage on that road as the portion reserved to the sellers. The evidence indicates that the location of the land taken by the State Roads Commission (and of the piece of land cut off by the parcel so taken

from the balance of the farm owned by the Dawsons) is established by State Roads Commission plats. It would therefore appear a relatively simple task to compute from those plats and from the plat furnished by the sellers to Mr. Measell the exact acreage owned by the sellers east of the land acquired by the Commission, and the testimony shows that this was about 86 or 87 acres. It would then present no difficult problem to a surveyor to locate precisely the bounds of the tract to be retained by the sellers, using the southernmost 200 feet of their land fronting on Old Route 240 as the eastern line, the southern boundary of the entire tract as the southern line, and by then completing a parallelogram of appropriate area by using as the northern boundary a line parallel to the southern boundary extending westward (for a distance determined as stated below) from the northern end of the sellers' 200-foot frontage on Old Route 240, and by running a closing line southward parallel to Old Route 240 for 200 feet. The length of the northern and southern lines would be determined by merely dividing the number of square feet to be retained by the sellers by 200. Since an acre contains 43,560 square feet, the length of the northern and southern boundary lines would be 217.8 feet for each acre to be retained by the sellers. In this connection, it may be noted that the southern boundary runs without change of course for 3029.5 feet west of Old Route 240. It would, therefore, not be necessary to·resort to a tract having a shape other than that of a parallelogram in order to take care of the excess over 80 acres which is to be retained by the sellers and excluded from the tract to be conveyed to the purchaser. See *Loughran v. Ramsburg,* 174 Md. 181, 197 A. 804.

Starting with the premise that the 200-foot frontage on Old Route 240 is the eastern line of the tract to be retained by the sellers, we have assumed above that the southern line of that tract would be the southern boundary of their entire tract. Any other supposition would seem to us to border on the absurd, to borrow a phrase employed in *Moran v. Fifteenth Ward B. & L. Assn.,* 131 N. J. Eq. 361, 25 A. 2d 426, in which case the issue was which twenty-seven feet of frontage on a certain street out of a total of a little over fifty-

six feet owned by the seller, was intended to be covered by a contract of sale. We think it clear that the contract here involved contemplated an even width from north to south of the tract retained and that the closing line at the west should run parallel to the eastern boundary. The contract calls for "*a* depth," not varying depths, for this tract. (Italics supplied.)

It has been held in a number of cases in other jurisdictions that in the absence of wording to the contrary, boundary lines of conveyed property are to run straight and be parallel to their opposite numbers. *Collins v. Dresslar,* 133 Ind. 290, 32 N. E. 883; *Mendota Club v. Anderson,* 101 Wis. 479, 78 N. W. 185; *Smith v. Nelson* (Mo.), 19 S. W. 734.

We think that this phase of the case is covered by what was said in *Neuland v. Millison,* 188 Md. 594, 604, 53 A. 2d 568: "In order to obtain specific performance, 'the description must be such as to enable the court to determine with certainty, with the aid of such extrinsic evidence as is admissible under the rules of evidence, what property was intended by the parties to be covered thereby. The description need not be given with such particularity as to make a resort to extrinsic evidence unnecessary. Reasonable certainty is all that is required.' *Powell v. Moody,* 153 Md. 62, 66, 137 A. 477, 478. Cf. *Helmik v. Pratt, supra* [153 Md. 685, 139 A. 559]. A description may be sufficient although the contract necessarily contemplates a survey to prepare a more complete description. *Powell v. Moody, supra,* 153 Md. 67, 137 A. 477."

*Cost of a Survey.* Both parties proceeded during the summer and at least a part of the fall of 1955 on the assumption that a survey of the property was necessary. On August 4th Mr. Dawson wrote to Mr. Sigler asking that the deposit of $1,000 which had been made by the purchaser with Mr. Sigler be turned over to Mr. Dawson because he needed it "very badly" to finish this house "and get this land surveyed." The title company handling the matter reported that it found the title satisfactory and was prepared to put through the settlement as soon as a survey was made and a proper description of the land based thereon was furnished. Difficul-

ties developed over the choice of a surveyor. One selected by Mr. Dawson was not on the title company's, list of approved surveyors. For some time, up to early October, it appeared that Mr. Dawson was going to have the survey made; later he refused. Efforts were made to divide the cost. Finally, Mr. Baker sent surveyors to the property to make the survey, but Mr. Dawson ordered them off the land. Still later Mr. Baker offered to accept a deed without a new survey being made.

Our study of the case leads us to think that the appellant is correct in taking the position stated in his brief that a survey would be desirable but not necessary.

If a survey was necessary to an effective conveyance, the purchaser, or his assignee, we think, should have furnished it, in the absence of any contrary agreement, because of his undertaking to pay the costs of conveyancing. However, its absence does not bar the appellant from specific performance. The contract did not make time of the essence, the appellant was justified in expecting that the appellees would have the survey made at least up to a few days before the settlement date provided for by the contract, and after it became evident that the appellees would not do so, the appellant sought to have the survey made at his own expense. We think he was not too late, since time was not of the essence. See *Chapman v. Thomas*, 211 Md. 102, 126 A. 2d 579, and cases therein cited, and *Loughran v. Ramsburg, supra*.

*Indefiniteness as to the Terms of the Deed of Trust.* The absence from the contract of many usual terms found in deeds of trust or mortgages, such as covenants to pay taxes or insurance (the latter of which appears of trifling importance in this case) and provisions with regard to foreclosure is not fatal.

The Code (1957 Ed.), Article 21, Sec. 68, states that the "following forms shall be sufficient to convey real or personal property". Then follow several sections setting forth forms of deeds and other instruments. Among them is Section 71, which is captioned "Form of Deed of Trust to Secure Debts, Indemnify Securities, or Other Purposes" and reads as follows:

"71. This deed, made this .... day of ........, in the year ....., by me, ............, witnesseth, that whereas (here insert the consideration for making the deed,) I, said ............, do grant unto ............, as trustee, the following property, (here describe the property,) in trust for the following purposes, (here insert the purposes of the trust, and any covenant that may be agreed upon).

"Witness my hand and seal.

"Test:

A. B.                                                    [SEAL.]"

In many respects a deed of trust is a mortgage (*Manor Coal Co. v. Beckman,* 151 Md. 102, 133 A. 893), but in some respects there are differences. (*LeBrun v. Prosise, supra.*) Recently, they have been brought more closely into line with each other through extending the same priorities to a purchase money deed of trust as to a purchase money mortgage. (Acts of 1955, Ch. 369, effective shortly before the contract here involved was made; Code (1957), Art. 66, Sec. 4.)

Some terms of the deed of trust are spelled out. It is to be on the premises sold and is to secure an aggregate of $29,000, payable "on or before" eleven years from date of settlement, with interest at the rate of 5% per annum, and "payable $2,000 or more each year, plus interest." In addition, there are the release provisions set forth in Schedule A, and any amounts paid pursuant to those provisions are, we think, to be in addition to the minimum payments of $2,000 a year. Any balance remaining unpaid at the end of eleven years is then due. All of these provisions can readily be covered by the deed of trust, and we find no inconsistency between them. This case falls under the second decision (based upon an amended declaration) in *Applestein v. Royal Realty Corporation,* 181 Md. 171, 28 A. 2d 830, rather than under the first decision in that case which is reported in 180 Md. 274, 23 A. 2d 684. See also *Quillen v. Kelley,* 216 Md. 396, 140 A. 2d 517.

Another term of the contract relating to the deed of trust can readily be met—that the trustees shall be named by the

persons secured, the Dawsons. The contract shows that the deed of trust is to secure a part of the purchase price, and the deed of trust should so state.

We should have no doubt that if the question presented was whether or not a deed of trust in some particular form was in conformity with the contract, it would be found to be so if it were in any form in general use in Montgomery County. That, however, is not the precise question before us, and no actual form of deed of trust has been tendered by the purchaser or offered in evidence. Doubtless such a form could readily be procured, and the appellant has expressed a willingness to execute any such form in use by the title company handling the settlement. The appellees, however, have rejected any such offer and stand on their contention that the contract as drawn is too indefinite to be specifically enforced and say that there is no proof of any customary form. A consequence of this position may be that they will wind up with a less desirable instrument than they could easily have had for their own protection. If they should find themselves in that position, it would seem that they would simply have to take what the contract calls for. *Hartsock v. Mort,* 76 Md. 281, 291, 25 A. 303; *Quillen v. Kelley, supra.*

They point out the absence of any foreclosure provisions, and it is certainly true that no default clauses with a power of sale exercisable upon default are spelled out. It may. also be quite true, as they contend, that there is no one standard or customary form of deed of trust in general use in Montgomery County dealing with such matters. However, we think that there is no serious difficulty in inferring from the terms of the contract a right of foreclosure which the beneficiaries of the trust may enforce in the event of default in the payment when due of any of the sums, principal or interest, specified in the contract. In *Manor Coal Co. v. Beckman, supra,* there was a deed of trust in the nature of a mortgage which had been executed to secure bonds issued by a coal company. The holders of a majority of these bonds exchanged them for bonds of another coal company. The holders of a minority of the bonds called upon the trustee under the deed to exercise the power of sale conferred there-

under, which the trustee refused to do. This Court held that the minority bondholders could enforce their lien in a court of equity under its general chancery jurisdiction. A deed of trust such as is provided for here is just what this Court declared the deed of trust in the *Manor Coal Co.* case to be: a conveyance of land as security for a debt. The addition of a power of sale did not change its character any more than the addition of a power of sale changes the character of a mortgage. (See 151 Md. at 115.) Quite possibly, as stated in *Jones on Mortgages,* 7th Ed., Secs. 358, 1134, the sellers could protect themselves against loss through any failure of the purchaser to pay taxes by paying the taxes themselves and obtaining reimbursement out of the proceeds of sale, and by subrogation they could maintain a priority over junior incumbrancers, if there were any. Cf. *Young v. Omohundro,* 69 Md. 424, 16 A. 120.

The appellees' claim of vagueness based upon the absence of any provision as to who should procure and pay for a survey in connection with a release is without force. The contract does not obligate them to do so; and if the purchaser wants a release and needs a survey to obtain it, he must undertake to get it and pay for it.

We think that the contract contemplates the payment of interest annually, except that if a release is sought, interest must be paid on the principal sum paid for the release up to the date of the release.

The absence of a defeasance clause is likewise of no significance. The deed of trust is to secure payment of the purchase price. When it is paid, the purchaser is entitled to a release. That is implicit in the contract and could be made explicit in the deed of trust.

### Delay

What we have said above in considering the matter of a survey disposes of any defense advanced by the sellers based upon delay in settlement.

### Conclusions

We hold that Baker, as assignee of the purchaser, Auerbach, is entitled to a decree of specific performance against

the sellers, the Dawsons. The decree may allow Baker the option of paying the entire balance of the purchase price in cash or of executing and delivering a deed of trust securing the deferred payments in accordance with the contract. If the question as to Auerbach's joinder in the deed, which has not been decided and which we have left open, is resolved as requiring his joinder, the decree should be conditioned upon Baker's procuring his joinder. The terms of the deed of trust will be sufficient if they meet the requirements of the statutory form and embody such additional terms as are to be derived from the contract. We have commented on these. Doubtless such a deed of trust would be much less full in its terms than deeds of trust serving much the same purposes as mortgages which are in general use in the area where this land is located. If the parties should agree upon the use of some such form (and Baker offered to execute such a deed of trust), there is no reason why it should not be used; but in the absence of such agreement (and there being no proof of any customary terms), the sellers are entitled to no more than what they bargained for. If a survey is necessary, it should be made at Baker's expense.

Several matters are left open which may require further consideration in the Circuit Court. Therefore, in reversing the decree in accordance with the views above expressed, we deem it appropriate to remand the case to the Circuit Court for further proceedings not inconsistent with this opinion and, following a determination of such matters left open as may require decision, for the passage of a decree for specific performance likewise not inconsistent herewith.

> *Decree reversed and case remanded for further proceedings and the passage of a decree for specific performance, not inconsistent with this opinion; the costs of this appeal to be paid by the appellees.*