PATTON *v.* GRAVES, ET UX.

[No. 490, September Term, 1965.]

*Decided December 6, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Morris Topf,* with whom was *Joseph S. Cullins, Jr.,* on the brief, for appellant.

*Leonard C. Collins* for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Can a contract for the sale of realty be enforced if it is made on Sunday? Before that question, the principal one in this appeal, can be answered we first must decide whether the contract was, in fact, made on Sunday.

In August 1963, the appellant (Mrs. Patton), an elderly widow, paid $22,000 for a brick dwelling in one of the residential areas of Prince George's County. It was not long before she began to realize that her purchase was unwise. The property with a broker early in February, 1964. She wanted $22,000 she found it difficult to obtain employment. Discouraged by diminished income, illness and unpaid bills she listed the property with a broker early in February, 1964. She wanted $22,000 but the broker listed it for $21,950 because, he said, "It sounds better."

Sunday, 1 March 1964, was a cold, damp day. Mrs. Patton had been taking medication, sedative in nature, for her arthritis and hypertension. Earlier in the day she suffered a chill when she went out to attend her injured dog. During the afternoon, Mr. Gillman, the broker's sales manager, showed the property to the appellees. They liked it well enough to offer $18,500. Gillman thereupon prepared a contract, using the broker's printed form. It is dated 1 March 1964 and recites the receipt of a deposit in the form of a promissory note for $250. Gillman inserted a provision requiring the *seller* to "pay all of purchaser's settlement or closing costs including V.A. appraisal and credit check" and another provision requiring the seller to pay a "maximum [of] three points." Appellees signed this contract while sitting in their car, which was parked in front of Mrs. Patton's house. They left immediately for their home. Gillman then brought the contract into the house and presented it to Mrs. Patton. At the time she was not herself, she said, because of the medication and the chill. Meanwhile another of the broker's salesmen, a Mr. Ciufolo, had arrived on the scene.

Graves (one of the appellees) testified that later in the day Gillman telephoned him saying Mrs. Patton would not sign unless he offered $250 more. When he refused Gillman said "if * * * [you come] up $150, she * * * [will] sign it." Graves refused and told Gillman "to forget it." Gillman then said, according to Graves, "Well, I think she will be in a position to sign it." Shortly thereafter Gillman again telephoned Graves and told him that Mrs. Patton had signed the contract.

According to Mrs. Patton when Gillman came in with the contract Ciufolo said, "This contract stinks!" Then he (Ciufolo)

told her to sign it, adding, "We will work out something in the office for you." She did not read the contract before signing it because Ciufolo was using her glasses. When she awoke around 2 A.M. she put on her glasses and, for the first time, looked at it carefully. Only then, she said, did she realize what she had done.

Included in the record extract is a letter dated 1 March 1964 from the broker to the appellees "enclosing * * * [their] copy of the sales contract." Graves thought he received the letter on Wednesday, 4 March. It seems to be agreed that this letter was actually written and mailed on Monday, 2 March.

On Monday morning, 2 March, Mrs. Patton went to the nearby home of Evelyn Edwards, who like herself was also a nurse, and asked her to call the broker's office and tell them to cancel the contract. Mrs. Edwards testified she made the call but the broker's president said the office had no record of such a call.

The Chancellor (Powers, J.) filed a brief opinion stating his reasons for granting specific performance. He held the transaction did not become an enforceable contract until the appellees received their copy of the contract. Since this occurred on the following Wednesday he found it unnecessary to consider the Sunday question. Judge Powers relied on *Baker v. Dawson,* 216 Md. 478, 141 A. 2d 157 (1958) which he thought was controlling. We take a contrary view.

In *Baker* the Dawsons listed 80 acres with a broker to sell for $500 per acre. The broker presented them with a contract signed by Auerbach (Baker's assignor) which called for the sale of 85 acres for $35,000. To meet objections by the Dawsons the broker, using a pen, changed the price from $35,000 to $42,-000. A few other changes were made all of which, including the new purchase price, were initialed by the Dawsons, whereupon they signed the contract. The broker took the signed copies to Auerbach, who approved the amended contract and initialed the changes. The broker then notified the Dawsons that the farm was sold. The broker also told the Dawsons that he would have the contract rewritten. He had it recopied on a typewriter, using the same printed form and incorporating verbatim all of the changes made with a pen. No other changes were made.

Auerbach and the Dawsons signed the rewritten contract on a Sunday. Chief Judge Brune, who wrote the Court's opinion, said:

> "The Chancellor held, correctly, we think, that a valid contract was entered into between the Dawsons and Auerbach between June 13th and June 18th. When the Dawsons adopted the amendments to the form of contract submitted by Sigler on June 13th and signed the agreement as amended by him during the conference on that date and delivered the agreement as revised to Sigler for submission to Auerbach, they made a counter offer. When Auerbach approved the changes (and initialed them) and so accepted the counter offer and notice of his acceptance was communicated to the Dawsons, as was done on or before June 18th, the contract was made." *Id.* at 484-85.

It seems to us beyond question that *Baker v. Dawson, supra,* requires a holding that the contract in the case at bar was made on Sunday, no later than the telephone call from Gillman to Graves advising him that Mrs. Patton had signed the contract originally submitted to her. It is interesting to note in this regard that appellees, in their bill of complaint, allege that they "entered into a written agreement" with Mrs. Patton on "March 1st, 1964."

A similar situation was before us in *Miller v. Herrmann,* 230 Md. 590, 595, 187 A. 2d 847 (1963). The broker, in that case, submitted to the Millers a contract signed by Herrmann calling for the sale of their property for $14,000 in cash, settlement to be within 30 days from the date of acceptance. When Herrmann signed the contract, the word "none" had been inserted opposite the printed language, "Property to be sold subject to an existing tenancy as follows . . ." This would have required the Millers to move just before Christmas, so, at the broker's suggestion, the words "60 days or sooner" were substituted for "none." The Millers initialed the change and the broker left with the contract. Within a few hours Herrmann had been notified by telephone of the change which he approved. Judge Hammond (now Chief Judge) said, for the Court:

"The sellers and the purchaser had had a meeting of the minds on all the essential terms of a sale and purchase of a piece of real estate, fully expressed in a writing, on the evening of November 13, 1960, when Mr. Herrmann accepted the contract he had previously signed, with the unessential and relatively insignificant modification as to the existing tenancy. This was not a situation where no contract was intended until a final draft evidencing all terms and conditions had been signed or initialled by both sides, as in *Binder v. Benson,* 225 Md. 456; rather, it was intended to be, and was, complete when Mr. Herrmann reiterated his agreement to buy under the slight modification proposed by the Millers. After that it was too late for them to call off the bargain they had made. *Baker v. Dawson,* 216 Md. 478, 485."

We turn now to the Sunday question. The statute provides that "No person whatsoever shall work or do any bodily labor on the Lord's day, commonly called Sunday; * * *." Code, Art. 27, § 492 (1957, Cum. Supp. 1966). Nor shall any person in this State "sell, dispose of, barter, or deal in, or give away any articles of merchandise on Sunday, except * * *." Code, Art. 27, § 521. It is settled that where the contract which the plaintiff seeks to enforce is expressly or by implication forbidden by the statute, no Court will lend its assistance to give it effect. *Goldsmith v. Mfgr's Liability I. Co.,* 132 Md. 283, 286, 103 Atl. 627 (1918); 17 C.J.S., *Contracts,* § 201.

No useful purpose will be served by extended comment on the subject of the Sunday laws which, over the years, have generated much work for the courts and unceasing turmoil in the General Assembly. All that might be said here seems already to have been said in *McGowan v. Maryland,* 366 U. S. 420 (1961), wherein the decision of this Court in 220 Md. 117, 151 A. 2d 156 (1959) was affirmed, and in *Richards Furniture Corp. v. Bd. of County Comm'rs,* 233 Md. 249, 196 A. 2d 621 (1964). In the circumstances it is remarkable that the question here presented seems never to have been decided by this Court. Perhaps even more remarkable is the fact that there are decisions of trial courts declaring Sunday contracts to sell realty

to be unenforceable, which were not appealed to this Court. Appellant suggests we might find three of those decisions to be persuasive. We shall consider them, in chronological order, not because they might be persuasive but simply because they show the respect and the importance some trial judges think should be attributed to the dicta in *Rickards v. Rickards,* 98 Md. 136, 140, 56 Atl. 397 (1903) and *Cook v. Pearce,* 160 Md. 434, 439, 153 Atl. 661 (1931).

In *Rickards* Chief Judge McSherry, who wrote the Court's opinion, observed:

> "No executory contract of sale made upon Sunday can be enforced. All parties agree to that proposition. But an *executed* contract though made on Sunday cannot be avoided merely because it was entered into on a *dies non.* A contract entered into on Sunday is a contract prohibited by the law; * * *."

The transaction in which Dr. Rickards, acting as agent for his wife, sold and delivered her horse to J. Nelson Rickards *was completed* on a Sunday. Two days later the wife replevied the horse. She argued that since the Sunday transaction was invalid, she could not be bound by the illegal act of her agent. Rejecting her argument the Court held that she was bound by the authorized act of her agent and that the sale, having been completely executed on Sunday, could not be rescinded even though it was illegal. One of the questions presented in *Cook v. Pearce, supra,* was whether a contract for the sale of land was unenforceable because it was made on Sunday. The Court found that the contract actually was made on Saturday. The Sunday question was not reached but there is a suggestion of approval of Judge McSherry's language in *Rickards.* Chief Judge Bond, for the Court, said:

> "Finally, is the contract, being executory, void and unenforceable because made on Sunday? *Rickards v. Rickards,* 98 Md. 136, 140, 56 A. 397. The record does not enable the court to find the fact to be that the contract was made on Sunday." *Id.* at 439.

Returning to the circuit court cases, the first is *Mundt v. Dubin,* 4 Baltimore City Rept. 788 (1928), wherein the plain-

tiff sought the specific performance of a contract for the sale of realty. Defendants, answering, said the contract had been made and signed on Sunday. The Chancellor (Stein, J.), after touching upon the history of the statute, the validity of Sunday contracts at common law and expressing his belief the case was one of first impression, said:

> "The question for decision here is, does the above legislation change the common law above quoted, and make unlawful a contract to sell lands entered into and completed on Sunday; this depends on the meaning of the word 'work' in the Act * * *."

In respect of Judge McSherry's statement in *Rickards,* which he quoted, he said:

> "This language, uttered by a judge of great learning and ability, while of much persuasive force, must be considered as applicable only to the question in the case then before the Court * * *."

Judge Stein went on to quote liberally from the opinion of Judge Thomas in *Levering v. Park Commissioners* (also cited as *Levering v. Williams*), 134 Md. 48, 57, 106 Atl. 176 (1919) wherein the words "work" and "labor" as used in the statute were defined. After pointing out the inapplicability of decisions from other jurisdictions cited by counsel he concluded:

> "Whatever other jurisdictions may hold, however powerful and persuasive the reasons therefor may be, they are not to be followed in a case involving 'the construction of a Maryland Statute,' which is determined by the policy of the Maryland law, and where that policy is 'to make Sunday a day of rest from secular employment,' it cannot be carried out either; (a) by making Sunday a day of rest only from physical work; or (b) a day of rest from one's ordinary occupation; such construction would leave the people free either (a) to engage in all kinds of mental work, or (b) in any works physical or mental, not one's ordinary employment.

"Plaintiff's counsel also urged that the Sunday law only prohibits the doing of work and bodily labor, of one's ordinary and usual occupation, and does not prohibit a single act.

"If one act is not inhibited, why should two be; if two, why three; when would the Act operate? One act as in this case may occupy several hours and be more wearying than a number of acts taking a much shorter time.

"A criminal statute is not to be so construed as to make the lawfulness of the Act forbidden to depend, either upon the time taken in doing the act, or in the number of times it has been done by the same person.

"'To carry out the policy of the Sunday law, that it be a day of rest, all kinds of work mental and physical must be unlawful (save those of necessity and charity excepted by the Act), whether the work be physical work or mental work; whether one's ordinary occupation, or not; whether a single act not one's occupation, or many such acts. The plaintiff's contentions, that neither mental work nor work not one's usual occupation is unlawful, would result: Either [*sic*] in allowing the doing on Sunday of any kind of work, physical or mental, not one's ordinary occupation. The first construction permits teachers, salesmen, members of all professions to pursue on Sunday their ordinary occupations, if not accompanied by physical exertion; the other construction permits the doing on Sunday of work or bodily labor, physical or mental, not the ordinary occupation, provided that the so doing would not result in two occupations, one followed during the week, the other followed on Sunday.

"Under either construction, Sunday would not be a day of rest from secular employment, and a law in force for more than two hundred years would be useless."

Next is *Lee v. Barnhart,* Equity No. 18187 (1956), in the Circuit Court for Montgomery County, in which a bill for the

specific performance of a contract to sell realty was defended on the ground that the contract was entered into on Sunday. The trial judge (Lawlor, J.) dismissed the bill of complaint stating she felt bound to "consider the *Rickard* [*supra*] case in the same light that the Court of Appeals considered it in *Cook v. Pearce* [*supra*] * * *."

In the third case, *Jordan v. Fraley*, Equity No. 29729 (1965), in the Circuit Court for Montgomery County the defendant demurred to a bill for the specific performance of a contract to sell real estate on the ground it was entered into on Sunday. The demurrer was sustained without leave to amend. No opinion was filed.

The impact on the Legislature of the pressures and counter-pressures for changes and revisions in the Sunday laws has been suggested earlier. As a result there will be found in Code, Art. 27, a section for nearly every county in the State exempting the activities of one or more special interests, ranging anywhere from the showing of motion pictures to the operation of bowling alleys and swimming pools. In Anne Arundel County, for example, even the operation of slot machines, euphemistically called "amusement devices," is permitted by § 509 of Art. 27. *McGowan v. Maryland, supra*. In Howard County retailers may sell chinaware, vegetables, dairy products and smoked meats. In Anne Arundel County retailers may sell many things, including disinfectants, pet food, artificial flowers, thermometers, surgical instruments, automobile accessories, and soap. But there will not be found in Art. 27, or any other article of the Code, anything exempting the making of written contracts for the sale of real estate, despite the fact that such transactions have been illegal in Baltimore City since 1928, by virtue of Judge Stein's decision in *Mundt v. Dubin, supra*, and in Montgomery County since 1956, by virtue of Judge Lawlor's decision in *Lee v. Barnhart, supra*. Nor can it be said that the Legislature has, at any time, been disinclined to tinker with the Sunday laws. Since 1928 there have been 20 sessions in which there have been either amendments or additions to Code, Art. 27, §§ 492-534 E, subtitle, "Sabbath Breaking." The extent to which the legislators may have been importuned to exempt realty transactions is, of course, unknown to us. We attach some significance, however, to information given to us at

argument by counsel for the appellant, no objection having been offered by the appellees. The president of the Senate, on the first day of the regular session of 1962, introduced a bill (Senate Bill No. 18), sponsored by the Legislative Council, which would have revised § 521 of Art. 27. The Real Estate Board of Greater Baltimore and the Home Builders Association of Metropolitan Washington made concerted efforts to have the bill amended so as to exempt the activities of all persons involved in the sale of realty. Senate Bill No. 18 died in committee but the Sunday laws were amended in the March Extra Session of 1962 and again in the sessions of 1963, 1964, 1965 and 1966. Whether the same exemption was sought by real estate interests at the later sessions is not in the record. As of this date, however, no such exemption appears in the statute. The lobbying activities of the real estate organizations suggest at least some apprehension on the part of their officers and attorneys that the Sunday operations of their members are illegal.

All things considered we feel bound to conclude that, in the circumstances, Judge McSherry's dictum in *Rickards, supra,* was, and still is, a correct statement of the law. Moreover, we must assume it reflects a public policy intended by the Legislature since in the intervening 63 years there has been no indication of a desire to change it. As Judge Delaplaine, in *State v. Magaha,* 182 Md. 122, 128, 32 A. 2d 477 (1943), said:

> "It is for the legislative branch of government to enact such measures as it deems desirable for the advancement of the public welfare, but the judiciary is the ultimate authority to determine whether constitutional restraints have been violated, confining itself to the question, not of legislative policy, but of legislative power."

If, as a result of this decision, the Legislature should conclude that the public welfare requires Sunday real estate transactions to be no longer proscribed, it has the power and the means to effectuate its conclusion.

*Decree reversed.*

*Appellees to pay the costs.*