WOEL, ET UX. *v.* GRIFFITH, ET UX.

[No. 237, September Term, 1968.]

*Decided May 8, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SMITH, JJ.

*David J. Preller* for appellants.

*L. Hollingsworth Pittman,* with whom were *William W. Cahill, Jr.* and *Weinberg & Green* on the brief, for appellees.

McWilliams, J., delivered the opinion of the Court.

The chancellor, Raine, J., declared the contract between the parties for the sale of realty "to be rescinded and null and void" because it had been entered into on a Sunday; 19 March 1967 to be exact. Oddly enough the contract would have been perfectly valid and enforceable had they postponed its execution until the first day of June, 74 days later. Laws of Maryland (1967), Ch. 196; Code, Art. 27, § 534F (1968 Cum. Supp.). Neither party has appealed from the declaration of nullity. The narrow question thus presented arises out of Judge Raine's refusal to allow the appellants (the Woels) to recover the $3,500 deposit required by the contract. We think the law of Maryland requires a contrary holding.

We shall dispense with a recital of the facts and circumstances leading up to the making and signing of the contract since the issue of its validity and enforceability is not before us. Immediately after signing the contract Dr. Gerard Woel went to France where he remained for about a month. Dr. Cecile Woel (his wife) did not go with him. Four or five days after his return to Baltimore, following a telephone conversation with Barney Griffith (appellee's brother), Dr. Woel "decided that * * * [he] was not going to go through with the deal any more." On 20 June 1967 the Woels filed their bill of complaint seeking a declaration that the contract was null and void and an order requiring the return of the deposit. Judge Raine, relying entirely on *Harrison v. Harrison,* 160 Md. 378 (1931), held that since the contract was illegal and the parties *"in pari delicto,"* they would "be left in the same position in which they * * * [had] placed themselves." That the contract was executory only appears to be conceded.

On only two prior occasions have we been asked to resolve questions arising out of contracts made on a Sunday. In *Rickards v. Rickards,* 98 Md. 136 (1903), Dr. Rickards sold and delivered his wife's horse to Nelson Rickards. The entire transaction was completed on Sunday. A few days later Mrs. Rick-

ards replevied the horse. In reversing the judgment of replevin, Chief Judge McSherry, for the Court, said:

> "No executory contract of sale made upon Sunday can be enforced. All parties agree to that proposition. But an *executed* contract though made on Sunday cannot be avoided merely because it was entered into on a *dies non*. A contract entered into on Sunday is a contract prohibited by the law; * * *." *Id.* at 140.

Judge McSherry went on to quote, with approval, from the opinion of Chief Justice Parker, in *Inhabitants of Worcester v. Eaton*, 11 Mass. 368 (1814):

> " '* * * in all acts which are unlawful on account of their immorality or because they are hostile to public policy, there the parties to the act are in *pari delicto* and *potior est conditio defendentis.*' " *Id.* at 141.

In December 1966, in *Patton v. Graves,* 244 Md. 528, after concluding that what was said in *Rickards* "was, and still is, a correct statement of the law," we reversed the decree of specific performance, holding that a contract to sell real estate, made on Sunday, is unenforceable. The concluding sentence of the Court's opinion is as follows:

> "If, as a result of this decision, the Legislature should conclude that the public welfare requires Sunday real estate transactions to be no longer proscribed, it has the power and the means to effectuate its conclusion." *Id.* at 537.

The General Assembly's reaction was prompt. Code, Art. 27, § 534F (1968 Cum. Supp.) as enacted by Chapter 196 of the Laws of Maryland (1967) is as follows:

> "No contracts hereafter entered into and executed by and between the parties thereto on Sunday shall be subject to the prohibitions and penalties elsewhere contained in this subheading."

We are not persuaded that the contract of sale under consideration here was immoral or that it was hostile to public

policy and, if our position is sound, then the parties can hardly be said to be *in pari delicto* since there is really no *delictum*. It must, of course, be conceded, as Judge McSherry said, that a Sunday contract, in March 1967, was still "prohibited by the law." But many acts prohibited by law are not immoral. Morality is certainly not involved in backing a motor vehicle into a space controlled by a parking meter, yet to do so is a violation of the law in many localities. *See, e.g.,* Baltimore City Code, Art. 31, § 196 (1966). Assuming a certain comparability it might be said that the operation of slot machines on Sunday is more nearly immoral than the making of a contract to sell real estate, yet the Legislature made lawful on Sunday in Anne Arundel County not only the operation of slot machines but a number of other activities as well. Code, Art. 27, § 509 (1967 Repl. Vol.) ; *McGowan v. Maryland,* 366 U. S. 420 (1961), Moreover, it ought to be noted that neither the appellants nor the appellees intended to violate the law. They seem to have been under the impression that counsel had obviated that possibility by using 20 March as the date of the contract instead of 19 March. Nor can the making of the contract be reckoned as hostile to public policy when it is pointed out, as we did in *Patton,* that the Legislature has exempted from the operation of the Sunday laws "the activities of one or more special interests, ranging anywhere from the showing of motion pictures to the operation of bowling alleys and swimming pools." Moreover, as earlier noted, the Legislature moved quickly after our decision in *Patton.* On 20 January, the third day of the 1967 session and *two weeks* after the mandate in *Patton* was issued, Delegate Docter introduced House Bill No. 40 providing for the exemption from the Sunday laws of "all *real estate* contracts." (Emphasis added.) An amendment by the Judiciary Committee broadened the exemption to *all contracts.* House Bill No. 40, as amended, became Chapter 196 and was finally passed on 23 March. It was signed by the Governor on 14 April 1967. It would be captious, we think, to regard this contract as hostile to public policy when, on the very day it was made, the arbiters of public policy were about ready to declare that *any* contract made on Sunday may be in accord with public policy.

The question then boils down to this—shall the Woels be de-

nied recovery of their $3,500 deposit money merely because the contract of sale is "prohibited by the law?" In the early case of *Maryland Hosp. v. Foreman*, 29 Md. 524 (1868), our predecessors affirmed a judgment for the recovery of money paid to a corporation pursuant to an *ultra vires* contract. Chief Judge Bartol said, for the Court:

> "Is he entitled to recover back the money paid under it, or does the principle *in pari delicto* apply?
>
> "If a contract be illegal in itself, or is in violation of some statute, or against public morals, courts of justice will not aid to enforce it, for the court will not contribute the means of infringing the law. *Merrick v. Trustees, etc.*, 8 Gill, 72; *Bayne v. Suit*, 1 Md. 86. *Such a contract, while it remains executory, may, in some cases, be disaffirmed by either party, and the money paid upon it recovered back.* But, after it has been executed, if it appear that the parties stand strictly *in pari delicto*, it is too late for either to disaffirm or rescind it, and the parties are left without remedy against each other. 1 *Story's Eq. Jur., sec.* 298, 2 *Parsons on Contracts*, 252, 253; *Sedwick v. Sedwick*, 6 Gill, 39." (Emphasis added.) *Id.* at 531.

A judgment for the recovery of money paid upon a contract for an illegal purpose was affirmed in *Harrington v. Boschenski*, 140 Md. 24 (1922). The factual details provide us with a wry sort of comedy. Early in the days of national prohibition (1920) Gerecht, a police magistrate, telephoned Boschenski whose business concerned near-beer. Mrs. Boschenski answered and was told by Gerecht that he had something important to tell her husband. She told him her husband was drunk and quite likely would remain so for some time. On the day following she herself went to the police station to see Gerecht. He told her Boschenski could buy some whiskey if he wanted it. She asked "how can you get whiskey; it is against the law." He satisfied her on this point and advised her that the whiskey would be delivered "in government trucks." She agreed to take 40 cases at $90 per case and on the following day she gave him $3,600. When Boschenski recovered from his bacchanal he went

to see Gerecht who sent him to Harrington. When Harrington suggested the illegality of the transaction Boschenski demanded the return of his money. Harrington said, "I ain't got no money." Judge Pattison, who delivered the opinion of the Court, said:

"The contract here involved, which was for the purchase and sale of whiskey, is treated by the defendant as an illegal contract, and, as he contends, is one upon which there can be no recovery by the plaintiff of the money paid thereunder by him.

"Assuming that the contract was an illegal one, or one the purpose or object of which was illegal, it was an *executory contract,* inasmuch as the defendant had not performed his part of it, and the plaintiff had the right at any time, before its execution by the defendants, to repudiate or disaffirm it, and to sue for and recover the consideration paid by him, not upon the contract, but independently of it. [Emphasis added.]

"In 13 *C.J.* 501 it is said, 'By the weight of authority, where money has been paid in consideration of an executory contract or purpose which is illegal, the party who has paid it may repudiate the agreement at any time before it is executed, and reclaim the money, for there is a *locus poenitentiae.*'

"In 6 *R.C.L.* 831, it is stated that 'it has been declared that a party who pays money on an illegal contract cannot recover it in a suit in which he insists on the existing validity of the contract, but to do so he must, before it is fully executed, rescind it, or do some act which, in law, is equivalent to rescission. The underlying reason of the rule permitting a recovery when the contract is still merely executory is the encouragement of the abandonment of illegal contracts and to prevent a violation of the law. The rule is, therefore, applicable regardless of whether the money is paid to the other party or to a third party such as a stakeholder. One who repudiates the contract and demands his money from the stakeholder before the illegal act has taken place is entitled to recover.' And such recovery

is had not under, but independently of the contract; the contract to be treated as a nullity. 6 *R.C.L.* 833." *Id.* at 30-31.

In general, it must be acknowledged, there is much conflict and confusion in other jurisdictions in respect of the recovery of money advanced upon contracts which are illegal because they violate the Sunday laws or where they are illegal for other reasons. *Compare* 83 C.J.S. *Sunday* §§ 27, 30, 35 (1953) *with* 17 C.J.S. *Contracts* §§ 272-78 (1963) ; *compare* 6A A. Corbin, *Contracts* §§ 1477-80 *with* §§ 1534-41 (1962). We think the position we have taken here is to be preferred, however, despite the fact that it seems to be the minority view. *See Bradt v. Amsden,* 255 Mich. 310, 238 N. W. 184, 185 (1931) ; *Rott v. Goldman,* 236 Mich. 261, 210 N. W. 335, 336 (1926) ; Cook, *Rescission of Bargains Made on Sunday,* 13 N.C.L. Rev. 165 (1935).

What the Supreme Court said in *Spring Co. v. Knowlton,* 103 U. S. 49 (1880), in allowing recovery of money advanced under an illegal contract, seems to be apposite here :

"Where money has been paid upon an illegal contract, it is a general rule that if the contract be executed and both parties are *in pari delicto,* neither of them can recover from the other the money so paid, but if the contract continues executory and the party paying the money be desirous of rescinding it, he may do so and recover back by action of *indebitatus assumpsit* for money had and received. And this distinction is taken in the books that where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, clearly such an action can in no case be maintained, but where the action proceeds in disaffirmance of such a contract, and instead of endeavoring to enforce it presumes it to be void and seeks to prevent the defendant from retaining the benefit which he derived from an unlawful act, then it is consonant to the spirit and policy of the law that the plaintiff should recover." *Id.* at 58.

458

*Accord, Duane v. Merchants' Legal Stamp Co.* 227 Mass. 466, 469, 116 N. E. 873 (1917); *Eastern Expanded Metal Co. v. Webb Granite & Constr. Co.,* 195 Mass. 356, 362, 81 N. E. 251 (1907).

In 17 Am. Jur. 2d *Contracts* § 224 (1964), it is said:

> "The courts frequently allow a party in pari delicto who repudiates the agreement while it is executory to recover whatever he has given thereunder, the recovery being, not under the agreement, but in disaffirmance of it, on a promise implied or a right existing independently thereof. Accordingly, it has been held in many cases that where the matters called for in the agreement that render it illegal do not involve moral turpitude, but are merely mala prohibita, either party, while it remains executory, may disaffirm it on account of its illegality and recover back money or property that he has advanced under it."

*Compare* 50 Am. Jur. *Sundays & Holidays* §§ 56, 58, 59 (1944).

There are, of course, a number of decisions of this Court in which the enforcement of illegal contracts has been denied and in which relief of one kind or another has been declared unavailable to the plaintiff. *E.g., Shirks Motor Express Corp. v. Forster Transfer & Rigging Co.,* 214 Md. 18 (1957) (contract in violation of Interstate Commerce Act); *Dowell v. O'Brien,* 199 Md. 299 (1952) (unlawful executed contract to construct a gambling establishment); *Messick v. Smith,* 193 Md. 659 (1949) (false representation precluded recovery on contract thwarting legislative purpose of price control and veterans' legislation); *Schill v. Remington-Putnam Book Co.,* 182 Md. 153 (1943) (contract in violation of Sherman Anti-Trust Act); *Baxter v. Wilburn,* 172 Md. 160 (1937) (contract based upon consideration of illicit sexual intercourse). None of those cases, however, presents a situation quite like the one before us. Griffith makes much of our recent decision in *Thorpe v. Carte,* 252 Md. 523 (1969), but that concerned an attempt to collect a commission on the sale of real estate and the comment

of Chief Judge Hammond, who delivered the opinion of the Court, establishes its dissimilarity to the case at bar:

> "Where the statute involved is (a) one for the protection of the public against incompetence and dishonesty, as is the Maryland statute [Code, Art. 56, § 227 (Splitting Fees) and § 228 (Unlicensed Person Cannot Recover on Contracts in Violation of Subtitle) (1968 Repl. Vol.)] and (b) there is a single contract for the payment of real estate commissions in part to an unlicensed person and in part to a licensed person and the licensed person's suit for part of the commission necessarily reveals the statutorily forbidden participation in the deal of an unlicensed person with the consent of the licensee, almost all courts have held that because the contract is illegal the licensed obligee will not be permitted to recover. [Citing cases.]" *Id.* at 530.

Since, as we have said, Judge Raine appears to have based his decision on *Harrison v. Harrison, supra,* we must consider whether the decision in that case is truly supportive. There husband and wife entered into an elaborate separation agreement. One of its provisions required the husband to pay $12,000 to the trust company (also a party). The trust company, in turn, was obliged to pay the $12,000 to the wife "upon presentation [by her] to * * * [the trust company] of a certified copy of a decree for an absolute divorce." Subsequently the husband sought the return of the $12,000 because "the agreement is without consideration and null and void, as being against public policy * * *." Judge Urner, who delivered the opinion, gives us the rationale of the Court's decision:

> "It was upon the wife's demurrer that the bill was dismissed. The demurrer denied the sufficiency of the bill to entitle the plaintiff to any relief in equity, and asserted that the agreement in question is not contrary to public policy, but is valid and binding and based upon a legal consideration.
>
> "In order to sustain the right of rescission asserted by the plaintiff, it is necessary to determine not only

that the agreement is void as tending to promote a divorce, but that the plaintiff can successfully challenge, on that ground, in a court of equity, the validity of his own contract.

"While the agreement undoubtedly contemplated a divorce, it did not depend for its efficacy upon the procurement of a decree to that end. It does not appear that there was any existing cause for an absolute divorce. The separation of the parties had continued for not more than a few months, and resulted, as the bill avers, from differences which were not 'especially serious in their nature.' In view of the limited duration of the abandonment charged by the wife, as stated in the agreement, only a partial divorce could be procured by her under any law of which this record enables us to take cognizance. Apparently no suit for divorce of any kind from the plaintiff has been instituted. Consistently with the specific terms of the agreement, the defendant wife could refrain perpetually from suing for a dissolution of the marriage. The stipulated weekly payments amount to much more than the probable income from the $12,000 fund if it should come under her control. The predecease of her husband would give her the same right to the fund, under the contract, as if she procured the absolute divorce, which was the alternative condition to her receiving it in full. If she should be survived by her husband, without the intervention of such a decree, $7,500 of the fund would be payable to her estate and be subject to her testamentary disposition. The considerations, permitted by the agreement, which might legitimately influence her against suing for a divorce, are substantially stronger than those tending to induce such action.

"It is not legally or equitably feasible to treat the provision for the $12,000 deposit independently of the other terms and conditions of the contract. The trust as to that fund was created as a part of the consideration for the wife's conveyance of her interest, as a tenant by the entirety, in the real estate to which the

agreement refers, and the release of all her marital rights in her husband's property." *Id.* at 382-84.

Judge Urner, continuing, observed:

> "*To the extent* to which the agreement *might be susceptible* of interpretation as an encouragement to a divorce, it is subject to the court's disapproval." (Emphasis added.) *Id.* at 384.

He then went on to discuss the rights *vel non* of the participants in contracts that are illegal, immoral or against public policy. It is clear, however, that his comment is *dictum* only and it is equally clear that it was upon this *dictum* that Judge Raine relied.

Appellees argue further that they ought to be allowed to retain the $3,500 because when they later sold their house they had to pay a real estate commission, whereas in the sale to the Woels the services of a broker were not required. We find this to be something less than persuasive. If appellees chose to employ a broker it was probably because they found it expedient to do so and not because it was necessary. There appears to be no reason why another buyer could not have been found by the use of the same advertisement that turned up the Woels.

While the enactment of Code, Art. 27, § 534F (1968 Cum. Supp.) makes unlikely the recurrence of a similar situation it should nevertheless be noted, and we so declare, that our holding goes no further than the case at bar and cases where the facts are essentially the same.

In light of what has been said the decree of the learned chancellor will be reversed and the case will be remanded for the passage of a decree reflecting the views announced in this opinion.

> *Decree reversed.*
> *Case remanded for the passage of a decree conformable with the views expressed in this opinion. Costs to be paid one-half by appellees and one-half by appellants.*