COPPAGE, Receiver for National Motors Insurance
Company *v.* RESOLUTE INSURANCE
COMPANY

[No. 178, September Term, 1971.]

*Decided January 18, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Joseph S. Kaufman,* with whom was *Jerome M. Asch* on the brief, for appellant.

*John C. Cooper, III,* for appellee.

SINGLEY, J., delivered the opinion of the Court.

The insolvency of National Motors Insurance Company (National Motors) precipitated a spate of litigation, of which this case is but a small part.[1] Here, John H. Coppage, National Motors' receiver, by an action instituted in the Circuit Court of Baltimore City, sought to have declared void an agreement which National Motors had entered into with Resolute Insurance Company, and to recover $17,917 which remained on deposit with Resolute by virtue of the terms of the agreement. From an order dismissing the bill of complaint, Coppage has appealed. We propose to affirm the order of the lower court.

A companion case, involving Coppage's exceptions to a claim for $175,267.29 filed by Resolute in the National Motors receivership, was consolidated with the instant case for purposes of trial, and terminated with the entry of an order which established National Motors' liability, but deferred, pending examination of claims and further

---

1. *See, e.g., Trimble v. Coppage,* 259 Md. 176, 269 A. 2d 563 (1970).

hearing, the entry of an order fixing the amount of Resolute's claim.

As a preliminary matter, Resolute moved to dismiss Coppage's appeal, arguing that it was premature, relying on Maryland Rule 605 a.:

> "a. *When Entered—As to Part or All.*
>
> "Where more than one claim for relief is presented in an action, whether as an original claim, counterclaim, cross-claim or third-party claim the court may direct the entry of a final judgment upon one or more but less than all of the claims only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates less than all the claims shall not terminate the action as to any of the claims, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims."

and on *Schafer v. Bernstein,* 256 Md. 218, 260 A. 2d 57 (1969) and *Silverman v. National Life Ins. Co.,* 255 Md. 148, 257 A. 2d 156 (1969).

We regard this reliance as misplaced. Here, two entirely separate and distinct cases were consolidated for purposes of trial as a matter of convenience as permitted by Rule 503. The rule applicable to such consolidated actions is Rule 606:

> "In a consolidated action, in a trial before the court, the court may render such joint or separate judgments, and in a jury trial, may require the rendition of such joint or separate verdicts as justice may require."

which contemplates the rendition of separate judgments, without a limitation of the sort imposed by Rule 605 a.,

which is applicable in instances where final judgments -are entered on less than all the claims in a single action. As a consequence, we shall deny the motion to dismiss and proceed to a consideration of the merits of the appeal.

National Motors qualified to do business in Maryland in May 1963, specializing in writing high risk automobile liability insurance for customers who could not obtain such insurance at standard rates. Faced with the problem that it was licensed to do business only in Maryland and Delaware, and desiring to expand its market, it cast about for some way of resolving this dilemma.

National Motors found in Resolute an easy solution to its problem. Resolute, a small but well established company, incorporated in Rhode Island, had its headquarters in Hartford, Connecticut.[2] Resolute was qualified to do business in the District of Columbia and every state except New York. It is essentially a specialty carrier, two-thirds of its premium income being derived from physical damage insurance written on financed motor vehicles and mobile homes, although a small amount of bodily injury insurance was written in Massachusetts.

In May of 1963, Stanley Orlove, the president of National Motors, as well as of Eastern States Insurance Agency, Inc. (Eastern) and Basin & Basin Insurance Agency, Inc. (Basin), which respectively wrote and sold policies for National Motors, approached Resolute with a proposition, which Resolute found attractive because it saw an opportunity to gain experience in a new field, where profits were thought to be high, at what was believed to be minimal risk.

The idea was essentially this. Basin would set up a sales office in New Jersey and sell policies of high risk insurance in that state. The policies would be on Resolute's forms, since Resolute was licensed to do business

---

2. Best's Insurance Reports—Fire and Casualty (1963) gave Resolute a "policyholders' rating" of A+ (excellent) and a "financial rating" of AAA.

in New Jersey, while National Motors was not. Resolute would authorize Eastern to issue policies in Resolute's name and to collect premiums, adjust losses and issue drafts, drawn on Resolute, in payment. All agency expenses were to be paid by Eastern. For the performance of Eastern's duties, Resolute would pay Eastern a commission of 20% of net premiums written, subject to adjustment for cancellations.

National Motors agreed with Resolute, on the other hand, that National Motors would reinsure Resolute to the extent of 100% of the risks assumed by Resolute on policies written in New Jersey. Additionally, Resolute was to receive 5% of premiums earned on the New Jersey policies, and any balance would be remitted to National Motors. National Motors guaranteed that this arrangement would generate in the first year $500,000 in earned premiums, on which Resolute would receive 5%, and deposited with Resolute a guaranty fund of $25,000, which would be reduced as Resolute collected its commission. The understanding was formalized by an agency agreement between Resolute and Eastern and Basin dated 14 May 1963, and by a reinsurance agreement between Resolute and National Motors executed by National Motors on 24 May.

In the less than 10 months' period between 1 June 1963, when the reinsurance agreement became effective and early March, 1964, when the National Motors insolvency proceedings commenced, Resolute received $187,-904.58 in premiums which ultimately would have been ceded to National Motors, after deduction of the commissions, because National Motors had accepted the risks under the policies. As it turned out, the $500,000 minimum guaranty was never met, and the $17,917 which is the subject of this suit represents the balance of the $25,000 guaranty fund which remained in Resolute's hands.

Under the agency agreement which Resolute had with Eastern, commissions on net premiums were remitted prospectively (*i.e.*, at the time policies were sold) rather

than retrospectively (when premiums were earned). These commissions were paid in the amount of $37,580-.88. In early January 1964, Resolute paid to National Motors $7,082, being apparently 5% of premiums earned to 31 December 1963, which amount was deducted from the $25,000 guaranty fund. If losses of $314,060.82 incurred by Resolute are added to commissions paid Eastern, premium taxes of $4,447.61 paid by Resolute, and the payment to National Motors, the total amount paid out by Resolute was $363,171.87. Crediting against this the $187,904.58 in premiums retained by Resolute, losses and expenses exceeded premiums collected by $175,267.29—the amount of the claim filed by Resolute in the National Motors receivership, which was the subject of Coppage's exceptions.

The principal thrust of the argument made by Coppage, as receiver for National Motors, is that the arrangement made by National Motors with Resolute was not a treaty of reinsurance at all, but merely a device permitting Resolute to "front" for National Motors. He argues that there are four reasons why the agreement should be rescinded:

(i) The solicitation and acceptance of a contract of reinsurance by a Maryland insurance company in a state where it is not licensed to do business violates Code (1957) Art. 48A, § 84 and therefore is illegal;

(ii) The contract was entered into in violation of the laws of Connecticut;

(iii) The alleged reinsurance agreement should have been submitted to the State Insurance Commissioner for approval, and in the absence of said approval is illegal; and,

(iv) The courts of Maryland will not enforce an illegal contract and where the parties to a suit for rescission are not *in pari delicto* as to the illegal act, the court will grant rescission.

### (i)

The solicitation and acceptance of a contract of reinsurance by a Maryland insurance company in a state where it is not licensed to do business violates Code (1957) Art. 48A, § 84 and therefore is illegal.

Judge Barrick, who heard the case below, found as a fact that Resolute was "fronting" for National Motors and Eastern but concluded that this did not, of itself, make the agreement illegal, and therefore null and void. Coppage challenges this conclusion, arguing that Code (1957) Art. 48A, § 84, which provided, in part:

> "It shall be unlawful for any insurance company, whether stock or mutual, reciprocal exchange or inter-insurers, Lloyd's Association, nonprofit hospital association, fraternal beneficiary association or any other plan of insurers, organized under the laws of this State, or any agent or representative of such insurers, to solicit and accept risks by advertisement or otherwise in any jurisdiction in which such company is not licensed in accordance with the laws of such jurisdiction."

made it illegal for National Motors to solicit and accept risks in a jurisdiction in which it was not licensed, and prevented its entering into a treaty of reinsurance in Connecticut, a state where it was not licensed.

Resolute says that there are two answers to this contention: first, that the reinsurance agreement was not entered into in Connecticut, where it was drafted by Resolute, but in Maryland, where it was accepted by National Motors, citing *Sun Ins. Office v. Mallick,* 160 Md. 71, 81, 153 A. 35 (1931). Resolute's second answer is that § 84 only encompasses the solicitation and sale of insurance policies and was never intended to apply to ceding or accepting reinsurance. It buttresses this argument by pointing to Code Art. 48A, § 249, which provides, in part:

"Any * * * mutual insurance company organized under the laws of or admitted to transact insurance in this State may by policy, treaty or other agreement, cede to or accept from any insurance company or insurer licensed in any state in the United States, reinsurance upon the whole or any part of any risk or risks, * * *."

Resolute says that the regulatory thrust of § 84 is directed at both stock and mutual companies, and properly so, because in most instances there is no reason to differentiate between them. Then it argues, by way of analogy, that there is no validity in the argument that § 249 should be read as conferring upon a mutual company a power which a stock company lacks, which would produce the illogical result that only a mutual company could negotiate a reinsurance treaty. We read § 249 as a confirmation of the fact that a mutual company has the same power to negotiate treaties of reinsurance that stock companies traditionally have had. This conclusion finds inferential support in Code Art. 48A, § 56, discussed *infra* under (iii).

Judge Barrick obviously accepted the testimony of Edward G. Crasper, an expert called by Resolute, who said in substance that while reinsurance arrangements were ordinarily used by insurers to lay off excess risks, they were frequently used in "fronting" arrangements when risks were pooled, as well as in instances where an insurer was not qualified in a particular state where a risk was to be undertaken. In Crasper's opinion, the agreement between Resolute and National Motors was a valid treaty of reinsurance. For a general discussion of reinsurance, *see* 19 *Couch on Insurance 2d* § 80:1, *et seq.* (1968); 13 Appleman, *Insurance Law and Practice* § 7681, *et seq.* (1943) and particularly *Volunteer State Life Ins. Co. v. Caldwell*, 157 Tenn. 241, 7 S. W. 2d 803 (1928), in which the court declined to treat premiums on policies written by a Tennessee insurer which had been ceded to an out-of-state insurer, not qualified to do busi-

ness in Tennessee, as being subject to the tax imposed on premiums on policies written by out-of-state companies.

In our view, Resolute had the better of this argument, and the chancellor's conclusion that the agreement was not "illegal and null and void per se" was eminently correct.

### (ii)
The contract was entered into in violation of the laws of Connecticut.

Coppage next argues that the agreement violated Connecticut law, citing General Statutes of Connecticut (1958, Rev. 1962) § 38-20 which prohibits unlicensed insurance companies from doing business and § 38-28 which provides that contracts of reinsurance shall be deemed insurance contracts, from which he concludes that an insurer not licensed in Connecticut cannot enter into a reinsurance contract with a company doing business there. Coppage overlooks the fact that § 38-28 goes on to provide that the hazard reinsured against shall be distinct from the hazard originally insured, and that no provisions of the statute relating to the form of insurance policies shall be applicable to reinsurance contracts unless the law specifically so provides.

Resolute counters with the argument that Coppage failed to give notice of his intention to rely on Connecticut law as required by Code (1957, 1971 Repl. Vol.) Art. 35, § 50, and that in the absence of such notice, the law of the foreign jurisdiction will be presumed to be the same as that of Maryland, *The Maccabees v. Lipps,* 182 Md. 190, 196, 34 A. 2d 424 (1943).

In addition, we are inclined to agree with Resolute that the giving of proper notice would not have altered the result, since the statutory construction urged by Coppage would require an expansive interpretation of Gen. Stat. of Conn. § 38-20 similar to that which Coppage would have had us give Code Art. 48A, § 84, a construction which we have rejected.

270

### (iii)

The alleged reinsurance agreement should have been submitted to the State Insurance Commissioner for approval, and in the absence of said approval is illegal.

If this argument is viable, it can only have been given life by virtue of the provisions of Code Art. 48A, § 56:

"(Reinsurance.) No stock or mutual insurance company, inter-insurer, reciprocal exchange, or Lloyd's, organized under the laws of this State, shall cede by reinsurance its entire schedule of policies or contracts of insurance or fidelity or surety bonds, or accept by reinsurance the entire schedule of policies or contracts of insurance or fidelity or surety bonds of any other insurance company, except by approval of the Insurance Commissioner; provided, that nothing herein contained shall be deemed to invalidate the ceding or acceptance of reinsurance pursuant to contracts of reinsurance previously lawfully made."

The short answer to Coppage's contention is that the total premiums ceded by Resolute to National Motors in 1963 and 1964 amounted to $187,904.58, while Resolute's total premium income was more than $15,000,000 in 1963 and more than $22,000,000 in 1964—a far cry from the statutory test of "entire schedule of policies or contracts of insurance"—words like those we construed in *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A. 2d 35 (1968) and determined that they should be given the import of their "plain and sensible" meaning. Even Coppage's contention that Resolute ceded all of its bodily injury risks finds no support in the record.

Coppage finds comfort in the fact that when the Insurance Code was amended by Ch. 553 of the Laws of 1963, effective 31 December 1963, Code Art. 48A, § 56 was succeeded by a new § 273, which prohibits a domestic

insurer from reinsuring either the bulk of its insurance or a major class of its insurance without the approval of the Insurance Commissioner. Reliance on § 273 is clearly inapposite here, since the provision deals with the cession of risks, and not the acceptance of risks, which was National Motors' role. Additionally, the new Insurance Code, by § 6 of Ch. 553, did not impair pre-existing contractual rights.

### (iv)

The courts of Maryland will not enforce an illegal contract and where the parties to a suit for rescission are not *in pari delicto* as to the illegal act, the court will grant rescission.

This argument rests on the postulate that both National Motors and Resolute were guilty of an illegal act when they entered into the reinsurance treaty and that therefore Resolute cannot prevail, *Patton v. Graves,* 244 Md. 528, 224 A. 2d 411 (1966), but that recovery can be had by Coppage who was not *in pari delicto, Maryland Hospital v. Foreman,* 29 Md. 524, 531 (1868). Since we have concluded that neither National Motors nor Resolute was guilty of an illegal act, we do not reach the question whether Coppage succeeded to rights superior to those which National Motors had prior to the insolvency. Nevertheless, in this connection, *compare* 45 Am. Jur. *Receivers* § 156 at 129 (1943) *with Levin v. Security Financial,* 246 Md. 712, 723, 230 A. 2d 93 (1967).

*Motion to dismiss appeal denied; order affirmed, costs to be paid by appellant.*