*In the Matter of the Donald Edwin Williams Revocable Trust and the Individual Beneficiary Trust of Linda L. Slacum*, No. 1499, September Term, 2016.

**APPELLATE PROCEDURE — DISMISSAL OF APPEAL FOR LACK OF FINAL JUDGMENT — CONSOLIDATION OF RELATED CASES IN CIRCUIT COURT**

Donald Williams died leaving an Estate having $3.5 million dollars in assets and a Trust having $35 million dollars in assets. Pursuant to his Estate plan, money in his Estate would fund an individual beneficiary trust ("IBT") for his long-time girlfriend; most of the rest of the Estate assets would pour over into the Trust; and the Trust assets would be paid over to a charitable foundation he had created ("Foundation").

Disputes arose among the Trustees of the Trust and the Personal Representative of the Estate over the funding of the IBT and other issues, resulting in five lawsuits, some in the orphans' court and some in the circuit court. The Foundation was not a party to these cases but participated in a mediation with the parties that resulted in an agreement and mutual release that the parties and the Foundation signed. After certain aspects of the agreement were performed, the Foundation was dissatisfied and filed two lawsuits (on the same day) in the Circuit Court for Wicomico County: 1) the "Removal Case," in which it sought relief primarily in the form of removal of the Trustees of the Trust, and 2) the "Damages Case," in which it primarily sought damages against the Trustees of the Trust. The circuit court granted a motion to consolidate the cases. Its order provided that the cases would share one case number and set of docket entries and would be handled together, except that the show cause hearing the Foundation was entitled to receive with respect to its petition to remove the Trustees would be held before the merits trials.

The Trustees filed motions to dismiss or for summary judgment in both cases. The court granted partial summary judgment against the Foundation in the Damages Case with respect to all claims it could have asserted as of the date of the mutual release. The show cause hearing went forward and thereafter the court dismissed the Removal Case with prejudice on the ground that there was no legal basis on which to remove the Trustees. The Foundation noted an appeal from that order. The Trustees filed a motion to dismiss the appeal for lack of a final judgment.

*Held:* The order dismissing the Removal Case is not a final judgment. The Foundation is the plaintiff in the Removal Case and in the Damages Case, and the defendants in the two cases overlap. The cases are based on the same allegations of fact and assertions of wrongdoing on the part of the Trustees, differing only in the forms of relief sought. The court consolidated the two cases for that reason, except that it permitted the required show cause hearing to proceed in the Removal Case. Only partial summary judgment was granted in the Damages Case, and the parties were awaiting trial on the remaining claims in that case. Unlike *Coppage v. Resolute Ins. Co.*, 264 Md. 261 (1972), and *Yarema v. Exxon Corp.*, 305 Md. 219 (1986), the cases here are not separate

and distinct and were not consolidated merely for the convenience of holding a single trial. In granting the motion to consolidate, the court commented that the claims all could have been included in one action instead of two. It is clear that the court intended for the cases to be jointly disposed of. In both cases, the central issue is the effect of the mutual release on the Foundation's claims. As in *Waterkeeper Alliance, Inc. v. Maryland Department of Agriculture*, 439 Md. 262 (2014), the consolidated cases involve interrelated issues and disposing of them separately would be contrary to principles of judicial economy and the policy against piecemeal appeals.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1499

September Term, 2016

_____

IN THE MATTER OF THE DONALD
EDWIN WILLIAMS REVOCABLE TRUST
AND THE INDIVIDUAL BENEFICIARY
TRUST OF LINDA L. SLACUM

_____

Eyler, Deborah S.,
Leahy,
Harrell, Glenn T., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed:  November 1, 2017

This appeal is taken by the Donnie Williams Foundation, Inc. ("the Foundation") from an order of the Circuit Court for Wicomico County dismissing its petition for the court to assume jurisdiction over the Donald Edwin Williams Revocable Trust ("the Trust") and the Individual Beneficiary Trust of Linda L. Slacum ("the IBT") and to remove Linda L. Slacum, Kevin Myers, and William Smith, Esq., as trustees of those trusts ("the Trustees") (hereinafter "the Removal Action"). The Removal Action had been consolidated with a second action, also filed by the Foundation, asserting claims for constructive fraud, breach of fiduciary duty, negligence, an accounting, and unjust enrichment against the Trust, the IBT, and the Trustees, the appellees (hereinafter "the Damages Action"). The cases remained consolidated at the time the court dismissed the Removal Action.

The Foundation presents six questions for review, which we have condensed and rephrased as two:

> I. Did the circuit court err by ruling that a mutual release entered into between the parties (and others) concerning other litigation barred the Foundation from raising claims arising before April 22, 2014?

> II. Did the circuit court err by finding that removing the Trustees was not warranted by their making principal distributions to Slacum before funding the IBT; by their taking more than two years to fund the IBT; by the delays in distributions to the Foundation; by the delays in disclosures to the Foundation; or by their taking large commissions?

As a threshold matter, the Trustees have moved to dismiss the appeal, arguing that there is not a final, appealable judgment. The Foundation has opposed that motion. For the following reasons, we shall grant the motion to dismiss the appeal.

# FACTS AND PROCEEDINGS

Donald E. Williams ("Williams" or "Settlor") committed suicide on May 17, 2012, when he was 59 years old. He had been a successful real estate developer in Salisbury and died with assets valued at nearly $40 million. He was divorced and had no children. Both his mother, Loretta Williams ("Loretta"), and his father predeceased him in the year before his death. He had two brothers. Slacum was his companion for more than a decade.

### a.

### *The Estate Plan*

About eighteen months before his death, Williams engaged the services of an attorney to design an estate plan. On June 9, 2011, he executed his will ("Will"); established the Trust; and signed Articles of Incorporation ("Articles") creating the Foundation.

The Will named Debra Hall, a longtime employee and friend, as Williams's personal representative ("PR"); and, if she could not serve, it named Myers, a certified public accountant ("CPA") who also had worked for Williams for many years, as substitute PR. After Williams's debts and liabilities were paid, the Will was to "pour over" all of his remaining assets into the Trust.

The Trust was an *inter vivos* revocable trust to be "managed for Settlor's benefit during [his] lifetime and distributed to the beneficiaries . . . upon [his] death." § 1.03. As we shall discuss, the Trust beneficiaries were the Foundation and Slacum. During Williams's lifetime, he would serve as the Trustee unless and until he became

incapacitated. He was authorized to pay himself from the net income or principal of the Trust assets, "even to the extent of exhausting principal," for any expenses he deemed necessary or desirable. § 3.01.

Upon Williams's death, the Trustees were to "follow any directions of the [PR]" regarding the payment of funeral expenses and other debts, § 4.02, and were authorized to pay any tax liabilities and any "other costs incurred in administering the deceased Settlor's estate." § 4.03. Certain motor vehicles and watercraft were to be distributed to Loretta, free of trust, but as mentioned, she predeceased Williams. After the payment of expenses, taxes, and any other debts, and the distribution of the assets to Loretta, the Trustees were to "pay the remaining principal and undistributed income (collectively the "Residuary Assets") as hereafter provided." § 4.06. The Trustees were directed to set aside assets in "an amount equal to the unified credit applicable to the Settlor's estate pursuant to Section 2010 of the Internal Revenue Code of 1986, as amended, and the state death tax credit (provided use of the state death tax credit does not require an increase in the state death taxes paid) . . . ." § 4.07. These assets were denoted the "[IBT] Assets."[1]

The Trustees were to "divide the remaining [IBT] Assets . . . into . . . separate trusts" for the benefit of individual beneficiaries "in accordance" with certain percentage interests set forth in the Trust. § 4.11. At the time of Williams's death, the individual

---

[1] Two properties—a house in Salisbury and a condominium in Ocean City—were to be set aside in trust for Loretta's use during her lifetime and, upon her death, sold, with the net proceeds distributed to the Foundation. §§ 4.09 and 4.10. Because Loretta predeceased Williams, these provisions did not take effect.

beneficiaries were Slacum (80%) and Loretta (20%).[2] Each individual beneficiary of an IBT was entitled to be paid the "net income earned" by her IBT at least quarterly until the IBT terminated upon her qualifying for Medicaid or dying, whichever occurred first. § 4.13. At the termination of the IBT, the principal balance and any remaining undistributed income was to be distributed outright and free of trust to the Foundation. § 4.15.

Aside from the IBT Assets, all of the remaining Residuary Assets were to be distributed to the Foundation outright and free of trust. § 4.16. If the Foundation was no longer in existence or otherwise failed to qualify as a section 501(c)(3) organization, the Trustees were to distribute the remaining assets to other nonprofit organizations serving similar purposes as the Foundation. § 4.17.

To administer the Trust, the Trustees were accorded "all powers, authorities and discretions granted by common law, statute, and under any rule of court." § 5.01. They further were "expressly authorized and empowered" in their "sole and absolute discretion" without prior court approval to, *inter alia*, invest and reinvest assets; dispose of property owned by the Trust; pay, compromise, or settle any claims or demands lodged against the Trust; and make, execute, acknowledge and deliver deeds or other transfers of

---

[2] When the Trust was established, the IBT Assets were to be divided into three trusts by the following percentages: Loretta (90%), Hall (9%), and Hall's minor daughter, Savannah (1%). On June 22, 2011, Williams amended section 4.11 to decrease Loretta's percentage to 70% and to grant Slacum a 20% interest. Hall and Savannah's interests were unchanged by that amendment. Just over a month later, however, by amendment dated July 27, 2011, Williams eliminated Hall and Savannah as individual beneficiaries; increased Slacum's share to 80%; and decreased Loretta's share to 20%.

property. *Id*. The Trustees could not be held liable for "any loss or depreciation in the value of any trust, created herein," occasioned by investments or reinvestments of Trust assets made in good faith while exercising due care. § 5.02. Decisions concerning distributions to the individual beneficiaries who also were Trustees were to be made by the independent Trustees. § 5.03.

Pursuant to a "Spendthrift Provisions and Facility of Payments" section of the Trust, the Trustees were to "make . . . payments . . . directly to the beneficiary entitled to them and not to any other person" except as otherwise specified. § 6.01. The Trustees were granted

> the further power to make payments of any income or principal for a beneficiary (i) directly to the beneficiary; (ii) to the individual who is, in the judgment of the Trustee, in proper charge of such person, regardless of whether there is a court order to that effect; (iii) in the case of a minor, to a custodian for the minor named by the Trustee, to held [sic] as a gift under the Maryland Uniform Transfers to Minors Act, with the custodial arrangement continuing until the beneficiary reaches twenty-one (21) years of age; or (iv) by paying or applying any part or all thereof for a beneficiary's benefit or on a beneficiary's behalf . . . .

§ 6.02. These powers could be exercised "without any necessity of obtaining . . . approval of any court, and such payments made in good faith shall be deemed proper and shall be a complete release and acquittance of the Trustee therefor." *Id.* The Trustees were further empowered to "make discretionary payments of income or principal to any person after taking into consideration, or without taking into consideration, as the Trustee deems appropriate, any other income or financial resources reasonably available to said beneficiary." § 6.03.

Loretta, Hall, and Myers were named as successor co-Trustees. § 7.03. Williams later amended the Trust to name Slacum as a successor co-Trustee in place of Hall and Loretta. *See July 27, 2011 Amendment*.[3] He did not name a third successor co-Trustee, but also did not delete the provision of the Trust stating that there "shall always be at least three (3) individual Trustees . . . ." § 7.03. The successor Trustees were granted all the powers possessed by the Settlor as the initial Trustee. § 7.09.

The Articles of Incorporation for the Foundation established it for "educational and charitable purposes." Specifically, it was to support the schools in Wicomico, Worcester, and St. Mary's Counties by furnishing tutoring programs, after school homework assistance, and after school activities to provide a safe environment and to encourage physical activity. The Foundation would have as many as seven directors, but never less than three. The Articles named Williams, Hall, Myers, and four other individuals—Gregory Johnson, Mark Granger, Kimberly Granger, and Kirk Kinnamon— as the directors.

### b.

### *The Administration of the Estate and the Trust*

At the time of his death on May 17, 2012, Williams's estate ("the Estate") was valued at approximately $3,500,000 in assets and his Trust held $35,000,000 in assets. The Trust assets included five properties leased to CVS stores with complex "mezzanine financing"; two properties leased to Dollar General Stores; 130 unimproved lots; several

---

[3] At some point in June 2011, Hall abruptly left her employment with Williams.

improved residential lots; stocks; and some cash. Much of the real property was held by LLCs.

Almost immediately upon Williams's death, Hall as PR, on the one hand, and Slacum and Myers, as Trustees,[4] on the other, became embroiled in a series of battles over the payment of expenses and debts; the distribution of assets; and the disclosure of information. One disputed issue concerned the amount of assets to be set aside to fund the IBT (which due to Loretta's death was solely for Slacum's benefit). As noted, section 4.07 of the Trust required that assets with value equivalent to "the unified credit applicable to the Settlor's estate pursuant to Section 2010 of the Internal Revenue Code of 1986" be set aside to fund the IBT. The referenced regulation did not exist when the Trust was executed, however. The Estate took the position that the IBT should be funded with just over $1 million in assets and the Trustees took the position that it should be funded with over $5 million in assets. The parties also disagreed as to whether the value of assets set aside for the IBT should be reduced by 20% to account for Loretta's share in light of her death or whether the IBT should be fully funded.

In the second half of 2013, five lawsuits concerning the Trust and the Estate were filed. Within the probate case, the Trustees sought to have Hall removed as PR, *see Linda L. Slacum et al. v. Debra W. Hall*, Case No. 22-C-13-001377, and in a second suit they sued the Estate seeking declaratory relief construing the Trust provisions pertaining to the IBT funding amount, the number of Trustees, and other issues. *See Linda L.*

---

[4]At that time, Slacum and Myers were the only Trustees. Smith was appointed as the third Trustee on February 28, 2014.

*Slacum, et al. v. Debra W. Hall*, et al., Case No. 22-C-13-001669. The Trustees filed two appeals from decisions of the Orphans' Court for Wicomico County in the probate case. *See Linda L. Slacum, et al. v. Debra W. Hall*, Case No. 22-C-13-001968; *Linda L. Slacum, et al. v. Debra W. Hall*, Case No. 22-C-13-002102. Hall sued the Trust, also seeking declaratory relief pertaining to the funding of the IBT. *See Debra W. Hall v. Donald Edwin Williams Revocable Trust*, Case. No. 22-C-13-001496. Hall's suit was voluntarily dismissed that same year. The Foundation was named as an interested party in the lawsuits concerning the amount of the funding of the IBT because until the amount of the IBT set-aside was determined the Foundation could not receive any distributions of Trust assets.[5]

On March 12, 2014, the Trustees, Hall, the Foundation, Slacum, and Robert Hall participated in mediation with a retired circuit court judge concerning the pending litigation.[6] As a result, on April 22, 2014, they executed a Settlement and Release Agreement and Release ("SAR"). The recitals in the SAR state that

> disputes [had] arisen between Ms. Hall, the Trustees and the Trust, and the Foundation with respect to, among other things, the disposition of the assets of the Estate, the disposition of the assets of the Trust, the interpretation of provisions of the Revocable Trust Agreement . . . , Ms. Hall's service as [PR], the Commissions claimed by Ms. Hall as [PR], and the compensation claimed by Ms. Hall's attorneys [and that those disputes had given rise to the lawsuits discussed above].

---

[5] As mentioned, funding of the Foundation also was contingent on its qualifying as a section 501(c)(3) tax exempt organization. That did not occur for more than two years after Williams's death.

[6] While not entirely clear from the record, we believe that Robert Hall is Debra Hall's husband.

The parties wished to "compromise and resolve the claims raised or which could have been raised in [those lawsuits] and any claims relating to, pertaining to or arising out of the subject matter of [those lawsuits] or the administration of the Estate." They agreed to "finally compromise and settle all issues that have been raised or which could have been raised between them in the [lawsuits] or otherwise" in accordance with the following pertinent terms.

The Foundation agreed to sign a non-disclosure agreement ("NDA"). The Trust and the Estate agreed that, after the NDA was executed, they would furnish the Foundation with copies of federal and state estate tax returns; all fiduciary tax returns with all schedules; and "[s]uch other documents as the Foundation might reasonably require to perform its responsibilities."

In consideration for these promises, the parties entered into a "Mutual Release" agreeing to "release one another" and their agents, successors, and assigns,

> from and against any and all actions, causes of action, suits, . . . controversies, . . . counterclaims, claims, and demands whatsoever, whether known or unknown, that relate to the subject matter of this Agreement, the Estate and/or [the lawsuits] and/or that were or could have been asserted in the Estate and/or [the lawsuits], [excepting claims that could be brought against the drafters of the Will, the Trust, and the Articles.]

Numerous exhibits were attached to the SAR, including a "Joint Stipulation as to Interpretation of Trust Agreement." As pertinent, the parties stipulated that the IBT should be funded in the "maximum amount that could pass free of federal estate taxes," which was determined to be $5,120,000, and that Loretta's 20% share of those assets

"was not intended to remain a part of the Residuary Assets to be distributed to the Foundation."

After the SAR was fully executed, the Trustees liquidated numerous assets held by the Trust, including the five CVS stores and many unimproved lots. They paid themselves commissions arising from the sales totaling just under $2 million.

On June 3, 2014, the Foundation secured its section 501(c)(3) status.

In September 2014, the Foundation executed the NDA required under the terms of the SAR and, in November 2014, it further clarified its interpretation of that agreement.[7] Thereafter, the Trustees provided the Foundation an accounting that comprised more than 11,000 indexed pages.

On March 31, 2015, the Trustees distributed to the Foundation a $20,237 money market account and three hedge fund accounts containing illiquid assets totaling $7,678,346, which had been purchased with Trust assets after Williams's death.

On April 23, 2015, the Trustees funded the IBT with assets valued at $4,270,942.79. They arrived at that amount by deducting $849,057.21 from the $5,120,000 stipulated funding amount. That deduction offset distributions of principal made to Slacum beginning shortly after Williams's death and continuing through April 2015, one of which was for Slacum to purchase a home in Salisbury.

Further distributions were made from the Trust to the Foundation on April 29, 2015, totaling $2,648,189, and on May 6, 2015, totaling $10,055,765. In total,

_____

[7] The delay in the execution of the NDA was occasioned by a dispute over the materials to which the Foundation was entitled.

-10-

$20,402,537 in distributions were made to the Foundation. The assets not distributed by the Trust to the Foundation covered taxes, fees, commissions paid to the Trustees, and monies reserved by the Trustees to cover anticipated attorneys' fees.

On July 28, 2015, the IRS completed its audit of the Estate's tax return. The IRS's closing letter, dated August 15, 2015, advised that the Estate owed no federal estate taxes.

*c.*

***The Removal Action and the Damages Action***

On September 16, 2015, the Foundation filed the Removal Action, stating two counts. In Count I, it asked the court to assume jurisdiction over the Trust and the IBT pursuant to Md. Code (1974, 2001 Repl. Vol., 2015 Supp.), section 14.5-201 of the Estates and Trust Article ("E&T") and Rule 10-501; to order an audit by a private auditor; to direct the Trustees to render an inventory and information report; and to appoint a special fiduciary to take possession of all property then held by the Trust and the IBT. In Count II, it asked the court to remove the Trustees; appoint a temporary trustee to administer the Trust and the IBT and take possession of the property held by them; and to direct the Trustees to file an accounting.

In support of both counts, the Foundation alleged that the Trustees had breached their fiduciary duties by:

- Failing to fund the IBT within a reasonable period of time following the Settlor's death.

- Failing to timely distribute to the Foundation the remaining residuary assets.

- Making principal distributions to Slacum.

-11-

- Selling Trust assets and then investing the proceeds in "risky . . . Hedge Funds" rather than distributing the proceeds directly to the Foundation.

- Filing misleading and/or incomplete Fiduciary Income Tax Returns ("Form 1041").

- Paying themselves commissions based upon the value of Trust property that should have been distributed to the Foundation and that exceeded that allowed by Maryland law.

- Paying themselves fees on the sales of assets that were improperly held and/or sold by them.

- Selling assets for amounts substantially below market value and otherwise making unauthorized and financially reckless decisions.

- Paying themselves expenses that were not authorized and/or reasonable.

- Failing to reasonably make financial reports to the Foundation.

- Instituting and maintaining frivolous lawsuits against the Estate.

The Removal Action named as "Interested Parties" the Trustees, the IBT, the Foundation, Hall, and an investment bank that held numerous Trust assets.

That same day, the Foundation filed the Damages Action, stating six counts. The defendants were the Trust, the IBT, and the Trustees, individually and in their capacity as Trustees. Counts I, II, and III asserted claims against the Trustees for constructive fraud, breach of fiduciary duty, and negligence in the performance of duties owed based upon the exact same eleven alleged breaches set forth, *supra*, and sought damages in excess of $75,000. Count IV alleged that the Trustees had failed to render an annual accounting upon request of the Foundation and asked the court to order an accounting and to enter judgment in favor of the Foundation for any "sums found to be due" after that

accounting. Count V asserted a claim for unjust enrichment against the Trustees for commissions, fees, and other distributions unjustly retained by them. Count VI requested that the court impose a constructive trust and order all monies owed to the Foundation paid to it.

On September 23, 2015, in the Removal Action, the court issued a show cause order. It directed the Trustees to file answers by October 26, 2015, and scheduled a hearing for November 12, 2015, to determine whether the court should assume jurisdiction over the Trust and/or the IBT and whether it should remove the Trustees.

On October 26, 2015, the Trustees moved (in both cases) to consolidate the Removal Action and the Damages Action; to shorten the time to respond to the motion to consolidate; to specially assign the cases; and to continue the November 12, 2015 show cause hearing. That same date, the Trustees filed an answer and a motion to dismiss or for summary judgment in the Removal Action. They argued in the motion that the claims against them were barred by the mutual release in the SAR and by *res judicata* and/or collateral estoppel arising from the earlier lawsuits. They also argued that the Foundation had failed to state a claim for which relief could be granted. The Trustees asked the court to dismiss the Removal Action or, in the alternative, if the court denied the motion to dismiss, to set a discovery schedule before holding a show cause hearing.

Two days later, in the Damages Action, the Trustees filed a motion to dismiss or for summary judgment on the same grounds they raised in the Removal Action.

In both actions, the Foundation opposed the motions to dismiss or for summary judgment. In the Removal Action, it maintained that the court had broad equitable

authority to assume jurisdiction over the Trust that was not affected by the SAR. In both actions, the Foundation argued that the release in the SAR was a special release, not a general release, and did not bar the claims raised by the Foundation; that the SAR was procured in breach of the Trustees' duties of candor to the Foundation, as the Trust's beneficiary, and therefore was unenforceable against it; that the SAR may not act as a bar to claims that the Trustees engaged in fraud; and that summary judgment was not otherwise warranted in light of the genuine disputes of material facts.

The hearing scheduled for November 12, 2015, was continued until January 7, 2016, and was consolidated with a hearing on the pending motions in the Removal Action and the Damages Action. On that date, the court heard argument and granted the motion to consolidate the two actions. It signed an order stating that the Removal Action and the Damages Action were "consolidated for all purposes, and further, *except that the show cause hearing [in the Removal Action] be held on March 21, 22, & 23, 2016*."[8] (Emphasis added.) It further directed that "all pleadings, papers and orders shall be . . . filed in [the Damages Action only]."

Also at the January 7, 2016 hearing, the court granted *partial summary judgment* in favor of the Trustees *in the Damages Action*. Its order, entered the same day, stated that partial summary judgment was granted as to "all claims, causes of action and bases for removal that could have been asserted as of April 22, 2014 *in [the Damages Action]*"

---

[8] The court signed the Trustees' proposed order, but supplemented it with the italicized language. The court struck out language stating "that hereafter all actions and proceedings in [the Removal Action and the Damages Action] shall proceed through trial simultaneously as if they were one action . . . ."

but that the court would "*reserve[] on its ruling*" "*with respect to [the Removal Action]*." The italicized portions all were handwritten by the court on a form order supplied by the Trustees. The court struck out language that stated "judgment be and hereby is entered" with respect to all of those claims.

Five days later, on January 12, 2016, the court entered a Memorandum Opinion and Order pertaining to the show cause hearing *in the Removal Action*. It explained, preliminarily, that it already had ruled that the SAR was "binding on the parties in . . . the . . . [D]amages [Action]." With respect to the Removal Action, it stated that, although the SAR did not "affect[] the Court's equitable powers," because the SAR was "procured as the direct result of mediation conducted by a retired circuit court judge and . . . [was] clear and unambiguous in its terms and because it has been signed by all the necessary parties with notice to legal counsel," the court would "decline[] to receive any testimony [at the show cause hearing] as to events or other proceedings which occurred prior to 22 April 2014." In other words, the court limited the evidence it would take at the show cause hearing.[9]

The Foundation filed a motion to alter or amend the January 12, 2016 Order, which the court denied.

The evidentiary portion of the show cause hearing took place on March 21 and 22, 2016. The major issues at the hearing concerned the distributions of principal to Slacum; alleged delays in funding the IBT and the Foundation; and the payment of commissions

---

[9] For that reason, the court reduced the number of hearing days from three (March 21, 22, and 23) to two (March 21 and 22).

to the Trustees. The Foundation called three witnesses: Albert Young, an attorney who was accepted as an expert in interpreting and administering trusts; Robert L. Stephens, a CPA who was engaged by the Estate as its tax preparer; and Mark Granger, the president of the Foundation. In the Trustees' case, they also called three witnesses: Smith; Raymond Peroutka, a lawyer and CPA who was accepted as an expert in forensic accounting, account reconciliations, and interpretation of financial records and recordkeeping systems; and Allan Gibber, Esq., an attorney who was accepted as an expert in estate and trust administration, charitable foundation creation and regulations, estate tax, and fiduciary income tax returns.

At the close of the evidence, the court directed the parties to submit proposed findings of fact and conclusions of law. On August 11, 2016, after it had received those submissions, the court reconvened to hear closing arguments.

On August 26, 2016, the court entered a memorandum opinion and order adopting the Trustees' proposed findings of fact and conclusions of law *in toto* and dismissing the Removal Action with prejudice. The court set out the grounds for the mandatory or permissive removal of trustees pursuant to ET section 15-112. As pertinent, that statute provides that the court "shall remove a fiduciary" who has "[b]reached his duty of good faith or loyalty in the management of property of the fiduciary estate" and the court may remove a fiduciary who has "[f]ailed to perform any of his duties as fiduciary, or to competently administer the fiduciary estate." ET § 15-112(a). Ultimately, the court concluded that there was no basis—mandatory or permissive—to remove the Trustees. We summarize the court's pertinent findings and conclusions:

- The Trustees "committed no breach of trust with respect to the funding of the IBT . . . that has any bearing on the Foundation's interests" and the "delay in funding the IBT . . . was not the cause for the delay in funding the Foundation." Rather, the delay in funding the Foundation "stemmed from . . . the Foundation's need to obtain 501(c)(3) status, the Trustees' need to liquidate assets, and the Trustees' concerns regarding open tax issues." Further, "mere delay in fulfilling a trustee's duties is not sufficient grounds for removal of a trustee absent evidence that the delay results from the trustee's lack of diligence." (Citing *Miller v. Rosewick Road Development, LLC*, 214 Md. App. 275 (2013)). "Accordingly . . . the Trustees' actions in funding the IBT . . . [did not] satisfy the grounds for either mandatory or permissive removal."

- The Trustees did not breach their fiduciary duties by their distribution of assets to the Foundation. The Trust did not require the immediate distribution of all the Residuary Assets to the Foundation but made distributions contingent upon satisfaction of certain conditions and granted the Trustees discretion to take other actions prior to making distributions. One condition precedent to distribution was that the Foundation qualify as a section 501(c)(3) charity. That condition was not satisfied until June 3, 2014. The Trustees also correctly perceived that certain assets held by the Trust, such as the CVS stores that "were financed with mezzanine loans, or negative amortization loans designed to offset phantom income," were not of the type that can be held by a section 501(c)(3) charity and that distribution of those assets to the Foundation "would have jeopardized [its] charitable standing." In the exercise of their discretion, the Trustees determined that those assets (and others) were not suitable for distribution to the Foundation; marketed them for sale; sold them; and distributed the net proceeds to the Foundation. Even if the Foundation was willing to "assume th[e] risk[ of holding those assets], it was well within the Trustees' discretion to decline" to make distributions for that reason, particularly because the Trust explicitly authorized the Trustees to liquidate assets before distribution.

- The Trustees' delay in funding the Foundation also was justified by their concerns about tax exposure for the Estate. The Trustees were obligated to pay all taxes owed by the Estate from the Residuary Assets and reasonably maintained a reserve in the Trust until July 28, 2015, when the IRS closing letter was received.

- Some of the delays in distributing assets to the Foundation also were caused by the Foundation's lack of diligence in securing signatures to facilitate the transfers. Moreover, the Foundation's refusal to sign a release and indemnity agreement proposed by the Trustees to protect the Trustees' from personal liability for any further taxes owed by the Estate also delayed the distribution. For all these reasons, the Trustees had discretion to delay funding the Foundation until conditions precedent to distribution had been met; until they had liquidated certain assets and until the "uncertain, contingent tax liabilities" were resolved; and they did not abuse that discretion by their conduct in making distributions to the Foundation.

- The Trustees were authorized by sections 4.12, 6.02, and 6.03 of the Trust to make principal distributions to Slacum, the sole individual beneficiary, and to do so in advance of and in anticipation of the IBT being funded. The Trustees' exercise of that discretion was appropriate in that all of the advance distributions were properly "accounted for and deducted from the total amount of funding authorized for the IBT."

- The scope of the Trustees' duties of disclosure to the Foundation was governed by the SAR and the NDA required by the SAR. The Foundation failed to execute the NDA until September 17, 2014, nearly five months after the SAR was executed, and delayed clarifying its interpretation of the NDA until November 11, 2014. Within two days after the Foundation clarified its interpretation, the Trustees turned over 11,207 pages of indexed documents to it. The Foundation did not request any further information for nine months. The Trustees "acted with reasonable promptness in providing information to the Foundation" and committed no breaches of trust in its disclosures.

- The Trustees were authorized under Maryland law to take commissions on the sale of real property held by the Trust, even if that property was held in an LLC. The commissions taken were consistent with the rates permitted by the local rule. Mr. Peroutka opined that the commissions allowed by statute totaled $1,923,126 and the commissions paid totaled $1,889,390. Thus, the Trustees did not commit a breach of trust by taking the commissions.

For all those reasons, the court ruled that the Foundation "failed to sustain its burden of demonstrating a basis for the assertion of jurisdiction and removal of the Trustees" and dismissed the Removal Action with prejudice.

This appeal followed.

## MOTION TO DISMISS

Appellate jurisdiction in Maryland is a "creature of statute." *Kurstin v. Bromberg Rosenthal, LLP*, 191 Md. App. 124, 131 (2010), *aff'd*, 420 Md. 466 (2011). With exceptions not applicable here, "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." Md. Code (1973, 2013 Repl. Vol.), §12-301 of the Courts and Judicial Proceedings Article ("CJP"). A judgment is "final" if it "disposes of all claims against all parties and concludes the case." *Miller & Smith at Quercus, LLC v. Casey PMN, LLC*, 412 Md. 230, 241 (2010). As Rule 2-602 makes clear,

> an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action . . . , or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action: (1) is not a final judgment; (2) does not terminate the action as to any of the claims or any of the parties; and (3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

The Trustees have moved to dismiss this appeal on the ground that there is no final, appealable judgment in the Removal Action because there are active and unadjudicated claims remaining in the Damages Action, with which it is consolidated. They maintain that the Court of Appeals's decision in *Waterkeeper Alliance, Inc. v. Maryland Department of Agriculture*, 439 Md. 262 (2014), holding that a judgment was not final in light of pending, undecided claims in a consolidated action, is dispositive.

-19-

The Foundation counters that a trial court has broad discretion to consolidate cases to promote judicial efficiency *and* to determine whether "joint or separate verdicts or judgments be entered." Md. Rule 2-503(a). It maintains that "unless the trial court clearly intends that a joint judgment be entered disposing of all cases simultaneously, consolidated cases are not to be treated as a single action for purposes of Rule 2-602." *Yarema v. Exxon Corp.*, 305 Md. 219, 236 (1986). It also maintains that, in the case at bar, the court made clear that it was consolidating the Removal Action and the Damages Action for a limited purpose and that its judgment dismissing the Removal Action was intended to be final and appealable.

We agree with the Trustees that the order dismissing the Removal Action is not a final appealable judgment. We explain.

Rule 2-503(a)(1) permits the court, on motion of a party or *sua sponte*, to order "a joint hearing or trial or consolidation of any or all of the claims, issues, or actions" in cases involving "common question[s] of law or fact or a common subject matter." "In the trial of a consolidated action, the court may direct that joint or separate verdicts or judgments be entered." Md. Rule 2-503(a)(2).

In *Coppage v. Resolute Insurance Company*, 264 Md. 261 (1972), the Court of Appeals construed the predecessor rules to Rule 2-503(a).[10] There, the receiver for an insolvent auto insurance company, Coppage, brought suit against another insurer,

---

[10] Rule 2-503(a) was derived from former Rule 503 and former Rule 606 without substantive change.

Resolute, to set aside an agreement between the insurers and recover damages. That case was consolidated, "for purposes of trial," with a "companion case, involving Coppage's exceptions to a claim for [damages] filed by Resolute in the . . . receivership . . . ." *Id*. at 262. The former case was dismissed and the latter case resulted in a judgment in favor of Resolute as to liability, with a decision on the amount of damages against the receivership deferred for a later hearing. Coppage noted an appeal from the dismissal of the complaint in the first case. Resolute moved to dismiss the appeal, arguing that the appeal was premature because it was taken from an order that did not adjudicate all of the claims against all of the parties.

The Court rejected that argument. It emphasized that the circuit court had consolidated "two entirely separate and distinct cases . . . for purposes of trial as a matter of convenience as permitted by [current Rule 2-503(a)(1)]." *Id*. at 263. Under those circumstances, current Rule 2-503(a)(2) "contemplates the rendition of separate judgments, without a limitation of the sort imposed by [current Rule 2-602], which is applicable in instances where final judgments are entered on less than all the claims *in a single action*." *Id*. at 263–64 (emphasis added).

Over a decade later, in *Yarema*, 305 Md. at 219, the Court of Appeals considered the effect of consolidation on the finality of a judgment in some, but not all, of four consolidated cases. That case involved claims against Exxon for contamination of land and groundwater in Baltimore County. The Yaremas and numerous other plaintiffs filed four separate cases against Exxon, its dealer, and other defendants, asserting claims for negligence, strict liability, nuisance, and trespass. The four cases were consolidated "for

the purpose of trial." *Id*. at 222. The court ordered that discovery would be consolidated as well, but "maintained separate docket sheets and separate files for each of the cases." *Id*. at 223.

After discovery was complete, a seven-week consolidated trial was held. During the trial, one defendant's motion for judgment was granted and "numerous settlement agreements [were reached] among the parties, although no one of the consolidated cases was entirely disposed of by settlements." *Id*. The claims against Exxon and its dealer in the four cases were not settled, however. When jury deliberations began, the court instructed the jurors "that 'each case is to be considered separately and independently.'" *Id*. at 224. The jurors returned four separate verdicts, awarding damages to each plaintiff against Exxon, but finding no basis for liability against its dealer. Thereafter, the Yaremas filed a motion for new trial in their case and Exxon filed a cross-motion for judgment notwithstanding the verdict, new trial, or remittitur in all four cases. The motions were denied, and the docket entries in all four cases reflected "[j]udgment [a]bsolute" as of that date. *Id*.

Exxon did not note its appeals in any of the cases until more than thirty days later because its lawyers believed there were no final judgments until the conclusion of additional proceedings to clarify the amount of each judgment. The plaintiffs in each case moved to strike Exxon's notices of appeal, and their motions were granted. Exxon noted appeals from the orders granting the motions to strike. Thereafter, Exxon discovered that there were unadjudicated claims in three of the consolidated cases, but not in the Yaremas' case.

Exxon's appeal from the grant of the motion to strike its notice of appeal in the Yaremas' case reached the Court of Appeals, on consideration of the following question:

> When a trial court consolidates several separate and distinct cases "for the purpose of trial" and at the conclusion of the trial a judgment absolute is entered in a particular case in which no open claims remain, is the judgment in that case unappealable until all open claims in all of the other cases have been fully resolved?

*Id*. at 231. The Court answered that question in the negative. It explained that its holdings in *Coppage* and another case, *Unnamed Attorney v. Attorney Grievance Commission*, 303 Md. 473 (1985), stand for the proposition that "unless the trial court clearly intends that a joint judgment be entered disposing of all cases simultaneously, consolidated cases are not to be treated as a single action for purposes of Rule 2-602; instead each one of the cases is to be treated as a separate action." *Id*. at 236.[11] Because the trial court had "directed the entry of separate judgments in each case . . . , each one of the consolidated cases [was] to be treated as an entirely separate action for purposes of Rule 2-602." *Id.* at 240. The Court ultimately agreed with Exxon, however, that the time to note an appeal from the judgment in the Yaremas' case had not begun to run until after the entry of a revised judgment and, thus, its notice of appeal was timely filed.

In 2014, the Court revisited the issue of finality of judgments in consolidated cases in *Waterkeeper*. In that case, the Waterkeeper Alliance submitted a public information

---

[11]*Unnamed Attorney* "involved an action to quash an administrative subpoena and a contempt action, which were treated as a single consolidated action in the trial court." *Yarema*, 305 Md. at 235. On appeal from the disposal of the administrative subpoena case, the Court of Appeals relied upon *Coppage* to reject the argument that the case was not final until the contempt action also was resolved finally.

act ("PIA") request to the Maryland Department of Agriculture ("MDA") seeking certain records concerning private farming operations on the Eastern Shore. The MDA denied the request on the basis that the requested records were exempt under a provision of the Agriculture Article. Thereafter, Waterkeeper and other environmental groups sued the MDA, alleging that they were entitled to the records under the PIA and asserting various constitutional claims ("WKA Action"). Later that year, a group of farmers and the Maryland Farm Bureau ("MFB") filed a separate action against the MDA seeking a declaratory judgment that the records sought by Waterkeeper (and the other plaintiffs in the WKA Action) were not subject to disclosure under the PIA ("MFB Action I"). The court granted a motion to consolidate the WKA Action and the MFB Action I.[12] The dockets were consolidated and MFB Action I was designated the lead case. The court held a hearing in the consolidated action on then pending cross-motions for summary judgment filed by MFB and the MDA; granted summary judgment in favor of the MDA; and entered a declaratory judgment directing the MDA to disclose the information requested by Waterkeeper under the PIA, with certain redactions ("the DJ Order"). The court did not rule on Waterkeeper's constitutional claims and there was no further activity in the consolidated cases.

Over a year later, the MFB filed another action against the MDA ("MFB Action II") seeking to enjoin the grant of a new PIA request filed by one of the plaintiffs in the WKA Action. MFB Action II ultimately was transferred to the same court as the

---

[12] The two actions had been filed in different courts, but the MFB Action was transferred to the circuit court where the WKA Action was pending.

consolidated cases and was dismissed. Following the dismissal of MFB Action II, the MFB filed a motion in the consolidated action seeking clarification of the DJ Order. The court issued two orders in the consolidated action: one clarifying the DJ Order and one closing the consolidated action. Waterkeeper noted an appeal from the clarified DJ Order. Ultimately, the appeal reached the Court of Appeals.

During oral argument, a member of the Court raised the question whether the DJ Order was an enrolled final judgment and, thus, whether the circuit court had revisory power pursuant to Rule 2-535 to enter the clarified DJ Order two years after it had been entered. That would become the central issue in the appeal. In its opinion, the Court explained that under Rule 2-602(a), an order that "'adjudicates *fewer than all* of the claims in an action'" is not a final judgment. 439 Md. at 279 (quoting Rule 2-602(a)) (emphasis in *Waterkeeper*). Ordinarily, in "[a]ssessing whether all claims have been adjudicated fully," the Court compares the claims raised in the complaint to the claims disposed of by the circuit court. *Id*. at 280. "In certain scenarios, however, where two or more actions are consolidated into a single case, introducing various claims in multiple complaints, the assessment may not be so straightforward or the result apparent." *Id*.

The Court observed that the circuit court retains discretion under Rule 2-503(a) to "determin[e] whether 'joint or separate . . . judgments be entered.'" *Id*. (quoting Md. Rule 2-503(a)). However, in the consolidated WKA Action and the MFB I Action, the circuit court had failed to "make explicit whether it intended to resolve the consolidated case in joint or separate judgments." *Id*. Under those circumstances, the appellate court must "determine from the record and the applicable law whether the consolidated action

-25-

should be treated as one case or multiple cases." *Id.* The *Yarema* Court had suggested

that absent clear evidence that the trial court intended that a joint judgment be entered, it

must be presumed that consolidated cases are to be treated separately. Yet, the

circumstances giving rise to consolidation in *Yarema*, where "four separate tort actions"

had been consolidated "for judicial efficiency," while "maintaining separate dockets and

entries for each action," "differ[ed] significantly" from those in *Waterkeeper*. *Id*. at 280–

81. In light of those differences, the *Waterkeeper* Court held that the trial judge had

"intended to resolve both actions in a joint disposition . . . [and] that he was compelled to

do so given the interconnectedness of the actions, the nature of the claims, and

Maryland's policy disfavoring piecemeal appeals." *Id*. at 281 (footnote omitted).

The Court explained:

> First, the trial judge recognized that the outcome of the two actions
> were meaningfully interdependent. If [Waterkeeper] prevailed on its claim
> that [a provision of the Agriculture Article was] unconstitutional, MFB's
> claim requesting a declaration interpreting that statute would be moot as the
> interpretation sought was not one amenable to a judicial gloss such as to
> save it from the unconstitutionality claim. The . . . [c]ircuit [c]ourt judge
> appeared to recognize this during [a hearing in the consolidated action] . . . .
> The practicality of deciding these particular actions together implores the
> judge to resolve both in a single disposition: it defies logic and offends
> greatly Maryland's policies favoring judicial efficiency to allow one claim
> to be appealed when later disposition of an unresolved claim in the same
> consolidated case could render the first adjudication moot.
> Second, upon granting the motion to consolidate the actions, the
> judge was well aware that the respective plaintiffs in the two actions
> presented countervailing requests with interdependent claims that were part
> of the same action from the start. In *Yarema*, the Court consolidated
> multiple distinct cases for the purposes of efficiency in the discovery and
> trial phases of the cases. . . . Unlike *Yarema*, and the cases on which that
> opinion is founded, the present case does not involve the consolidation of
> "two [or more] entirely separate and distinct cases." . . . Here, the
> consolidated cases are what the MDA describes aptly as "flip-sides of the

-26-

same coin"—the outcome of one of the cases could affect directly the outcome of the other.

* * *

Lastly, . . . the [c]ircuit [c]ourt maintained the WKA Action and the MFB Action on the same docket, whereas the court in *Yarema* maintained separate dockets for each individual action. . . . Although this is only a formal distinction, the amalgamation of the two actions into one docket, in addition to the interdependence of the actions and the court's attempt to engage in consideration of the effect of [Waterkeeper]'s pending constitutional claim in the same hearing in which it was addressing MFB's statutory non-constitutional claim, lends further weight to our conclusion that the trial court intended clearly to treat the actions as a singular case requiring a single disposition.

*Id*. at 282–83. The Court concluded that because the WKA Action and the MFB Action I "required a joint disposition, the finality of that disposition would be conditioned upon a complete adjudication of all of the claims presented by both actions." *Id.* at 284. Thus, the existence of unadjudicated claims in the WKA Action deprived the DJ Order of finality and the circuit court retained revisory power over that order more than two years later.

We return to the case at bar. The Foundation argues that this case is unlike *Waterkeeper* because the "interdependency of the consolidated actions" that existed there does not exist here.[13] Moreover, it maintains that the circuit court plainly intended the

---

[13] The Foundation relies on this Court's decision in *FutureCare Northpoint LLC v. Peeler*, 229 Md. App. 108 (2016). During the pendency of this appeal, the Court of Appeals decided *Deer Automotive Group, LLC v. Brown*, 454 Md. 52 (2017), which had the effect of overruling the part of the *FutureCare* case that is relevant here.

In *FutureCare*, Valerie Peeler filed a wrongful death action against the nursing home where her mother was residing at the time of her death. The nursing home filed a separate action against Peeler to compel arbitration because Peeler's mother had signed an arbitration agreement when she was admitted to the nursing home. On its own motion, the circuit court consolidated the two cases, but "maintained separate files for the

(Continued…)

-27-

entry of separate judgments disposing of the Removal Case and the Damages Case. We disagree.

The Removal Action and the Damages Action both named the Trustees, the Trust, and the IBT as interested parties/defendants. In both actions, the Foundation alleged that the Trustees had breached their fiduciary duties in identical fashion. In the Removal Action, the Foundation asked the court to assume jurisdiction over the Trust and the IBT; remove the Trustees; and administer the Trusts and the IBT. In the Damages Action, the

(…continued)

two actions." *Id*. at 117. At a hearing, the court denied the petition to compel arbitration. Counsel for the nursing home inquired as to whether the court was entering a final judgment in the action seeking to compel arbitration. The court responded that the matters had been "consolidated for 'a limited purpose,' but . . . were 'not joined for the merits' and ultimately would 'be treated separately[.]'" *Id*. The order entered by the court stated that the cases no longer were consolidated. The nursing home noted an appeal and a motion to stay the wrongful death action pending resolution of the appeal was granted.

In this Court, we raised the jurisdictional question whether the nursing home could appeal from the judgment denying its petition to compel arbitration while the wrongful death action remained pending. We explained that if the petition for arbitration had been filed within the wrongful death action, the denial of the petition would not have been immediately appealable. Nevertheless, we held that the order denying a separately filed petition to compel was immediately appealable. In so holding, we also addressed the effect of the consolidation on the finality of the judgment. Relying upon *Coppage* and *Yarema*, we held that because the court clearly had intended to enter a separate judgment disposing of the petition to compel, the two actions had not been consolidated "for the merits," and the court maintained separate dockets, the existence of unresolved claims in the wrongful death action did not deprive the judgment in the arbitration case of finality. Neither party filed a petition for writ of *certiorari*.

On June 27, 2017, however, the Court of Appeals decided *Deer Automotive*, a case involving an identical procedural posture. It held that although an order *compelling* parties to arbitrate is immediately appealable, because it puts the parties out of court, an order *denying* a petition to arbitrate—whether filed within a pending civil action or in a separate action—is not immediately appealable and must await the resolution of the underlying claim. The court expressly overruled this Court's holding to the contrary in *FutureCare*.

-28-

Foundation sought compensatory and punitive damages; an accounting; and the imposition of a constructive trust. The cases plainly are not separate and distinct; they pursue the exact same legal theories (breach of fiduciary duty; constructive fraud; negligence) based upon the exact same set of operative facts. Indeed, as counsel for the Foundation acknowledged in oral argument before this Court, the Foundation could have pursued all of its claims against all the defendants/interested parties in the Removal and Damages Actions in a single action.

The court recognized this at the January 7, 2016 hearing. After summarizing the relief sought in each action, the judge remarked: "So what would be the logical way to approach this? One thing, it seems to me these cases should be consolidated or one should just be dismissed." Thus, in the court's view, all the claims could have been and appropriately should have been included in one action. When the motion to consolidate was argued that day, the Foundation's counsel explained that his client agreed with consolidation "for purposes of judicial economy with regard to discovery, with regard to hearings," but disagreed "with regard to the trial." This was so because the Foundation was entitled to a prompt show cause hearing in the Removal Action, but was entitled to a jury trial in the Damages Action. In light of the differing remedies that were sought, which were the only significant differences between the two cases, the court granted the motion to consolidate "for all purposes" except that a show cause hearing would be held in the Removal Action. We agree with the Trustees that this was similar to a bifurcation of issues or claims within a single action and did not alter the fact that the consolidation was "for all purposes." Thus, it is clear that the court *did* intend a joint disposition of the

-29-

two cases.[14] Likewise, the court's decision to consolidate the dockets in the Damages Action evidences judicial intent to render a joint disposition, as the Court in *Waterkeeper* pointed out. The August 26, 2016 Order from which the Foundation appealed was docketed only in the Damages Action, a case that remains open.

The complete overlap of issues, short of remedies sought, implicates the strong policy against piecemeal appeals. In both actions, the effect of the mutual release in the SAR on the Foundation's claims was/is a central issue. In the Damages Action, the court granted partial summary judgment based upon the SAR as to all claims "that could have been asserted as of April 22, 2014." In the Removal Action, it barred the admission of any evidence at the show cause hearing that pre-dated April 22, 2014.

The August 26, 2016 Order, from which this appeal is taken, denied the equitable relief sought by the Foundation, but did not resolve the outstanding claims in the Damages Action for alleged wrongful conduct by the Trustees post-dating the SAR. While the relief sought was different, the allegations of wrongful conduct were identical. For example, the Foundation alleged in the Removal Action *and* in the Damages Action

---

[14] Indeed, a later colloquy during the show cause hearing makes this evident. The court questioned whether the Foundation was seeking to hold the Trustees liable individually for the allegedly wrongful actions they had taken, and counsel for the Trustees responded in the affirmative. Counsel for the Foundation responded: "That's in the other action, Your Honor." The court replied: "But it's consolidated now, we're in one case, you know that." Counsel for the Foundation agreed, but noted that the show cause hearing only pertained to the Removal Action. The court agreed that the only issue before it that day pertained to the Removal Action, but that it is "still one case." Thus, the court viewed its resolution of the issues unique to the Removal Action as not amounting to a separate, final adjudication of that case.

-30-

that "the commissions which the Trustees paid themselves from the Trust assets greatly exceeded commissions permitted under Maryland Law." The commissions were taken *after* April 22, 2014; therefore, they remain an open issue in the Damages Action. The court made findings adverse to the Foundation relative to the commissions in the August 26, 2016 Order, but has yet to resolve that same issue within the Damages Action. The factual and legal interdependency between the Removal Action and the Damages Action is such that the court was bound to enter a joint disposition. We note that even though the trial court has made a ruling in the Removal Action regarding the effect of the SAR, that ruling is interlocutory. In the course of trying the Damages Action, the court will be addressing the same issue and is free to revisit its decision until both actions are tried to conclusion. As all issues may be reconsidered, there is no final decision appropriate for this Court to review. Thus, it would "def[y] logic and offend[] greatly Maryland's policies favoring judicial efficiency," *Waterkeeper*, 439 Md. at 282, to allow the claims pertaining to the interpretation of the Trust Agreement and the SAR to be appealed immediately before the Damages Action goes forward in the circuit court.

For all these reasons, we shall dismiss the appeal as not having been taken from a final judgment.

**APPEAL DISMISSED. COSTS TO BE PAID BY THE APPELLANT.**